Sixth Division
September 30, 2008

No. 1-07-3200

| | | |
|---|---|---|
| THE CITY OF CHICAGO, a Municipal Corporation, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | 04 L 050520 |
| MIDLAND SMELTING COMPANY., d/b/a Midland Industries, Inc., an Illinois Corporation, and UNKNOWN OWNERS, | ) ) ) ) | Honorable Sheldon Gardner, |
| Defendants-Appellants. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the opinion of the court:

The present action involves a parcel of property owned by defendant, Midland Smelting Company (Midland). In a prior lawsuit, plaintiff, the City of Chicago (the City), attempted to acquire the property through the use of its power of eminent domain. That action was dismissed by the circuit court as an excessive taking. The City thereafter filed the present condemnation action seeking to acquire approximately half of the property that it had sought in the original action. The trial court denied Midland's traverse and motion to dismiss and then certified the following questions for interlocutory appeal pursuant to Supreme Court Rule 308(a) (155 Ill. 2d R. 308(a)):

1. Whether the judgment entered in the original condemnation action bars the present action under the doctrine of *res judicata*; and

2. Whether the City's proposed taking of Midland's property is a proper exercise of the City's power of eminent domain.

We granted Midland's petition for leave to appeal.

The present case centers on three pieces of property located within the City of Chicago. Midland owns a manufacturing plant on North Halsted Street in Chicago, Illinois, and also owns an approximately 25,000-square-foot parking lot located immediately north of the plant at 1316-1328 North Halsted Street (the Midland Property). Located directly across Halsted Street from the Midland Property is an 80,000-square-foot parcel of property commonly known as 1331 North Halsted (the 1331 property). Located directly to the north of the Midland Property is the property commonly known as 1332 North Halsted Street (the 1332 property).

The record establishes that in the 1960s, the Chicago city council designated the Clybourn-Ogden Redevelopment Area (the Redevelopment Area) as slum and blighted; approved the Clybourn-Ogden Redevelopment Plan (the Redevelopment Plan); and authorized the City to acquire land in the area for redevelopment by purchase, lease, gift, or eminent domain. The Redevelopment Area is triangular in shape and generally bound on the north by West North Avenue, on the east by North Ogden Avenue, and on the west by North Branch Canal. The Redevelopment Plan's objectives are to remove structurally unsound buildings in the Redevelopment Area and to allow existing structures to be redeveloped for residential, retail, commercial, and light industrial use. All three of the properties involved in this case are located within the Redevelopment Area.

In 1988, title to the 1332 property was placed in a land trust, No. 105006-01, with the 1332 Halsted Building Partnership (the 1332 Partnership) as the beneficial owner of the trust and American National Bank and Trust Co. (ANB) as the trustee. In 1988 and 1989, the 1332 Partnership sought to redevelop the 1332 property in accordance with the Redevelopment Plan

2

by converting the existing building on the property from an industrial use to a four-story loft-office building (the 1332 building) to be used for commercial purposes. The property, however, lacked adequate space for on-site employee parking that was required by City zoning laws. To supply the requisite parking and therefore facilitate that commercial development, the city council authorized the sale of the City-owned 1331 property to the owner of the 1332 property. After that sale, on November 1, 1988, title to the 1331 property was placed in a land trust, No. 106845-04, with the 1332 Partnership as the beneficial owner of the trust and ANB as the trustee.

The owner of the 1332 property thereafter entered into a Redevelopment Agreement with the City that required construction of a commercial off-street parking facility at the northern end of the 1331 property and provided the option of constructing a commercial/industrial complex south of the parking facility. In 1989, the City's Zoning Board of Appeals granted the 1332 Partnership two special use permits. The first permit allowed the 1332 building to be used for a commercial purpose even though it was zoned as a general manufacturing district. The second permit allowed for the establishment of an off-site parking facility on the 1331 property to satisfy the on-site parking requirements for the commercial use of the 1332 building. The second permit also required the 1332 Partnership to "maintain the property continuously in conformance with the provisions and standards hereby established under this order and §5.8-5 of the zoning ordinance," which provides:

> "In cases where parking facilities are permitted on land other than
>
> the zoning lot on which the building or use served is located, such
>
> facilities shall be in the same possession as the zoning lot occupied

by the building or use to which the parking facilities are accessory.
Such possession may be either by deed or long term lease ***. ***
The requisite parking facilities are required at all times; otherwise
the Zoning Administrator can recommend action through the
Corporation Counsel to have the use discontinued." Chicago
Municipal Code ch. 194A, §5.8-5 (1988).

In 1998, the City sought to further improve the Redevelopment Area by encouraging the private development of additional mixed-income housing in the area pursuant to the Near North Redevelopment Initiative. The Near North Redevelopment Initiative recommended demolishing an existing Chicago Housing Authority (CHA) public housing complex known as Cabrini-Green and replacing it with a mixed-income and mixed-use community. The new mixed-income housing was to be developed upon five acres of City-owned land that surrounded the 1331 property to the north, east, and south. However, the City-owned land created an irregularly shaped development site and the City determined that incorporating the 1331 property into the development would create a nearly rectangular parcel more suitable to development. Additionally, the 1331 property had not been fully developed in that the 1332 Partnership had not exercised its option of constructing a commercial/industrial complex south of its parking facility on the 1331 property. At the time, the 1331 property was zoned for industrial uses and the City intended to rezone the property to "Residential and Related Uses." Therefore, the City solicited proposals for development of the City-owned land into the mixed-income housing and also encouraged those submitting proposals to incorporate the 1331 property into the development.

The City ultimately selected North Town Village to develop the desired housing, which included 261 units of housing, approximately half of which were units to be made available to low-income families (the North Town Village Project). The North Town Village proposal included the 1331 property and therefore the City's Community Development Commission (Commission) recommended acquisition of the 1331 property for redevelopment "in furtherance of the Clybourn-Ogden Redevelopment Plan." According to the Commission, acquisition of the 1331 property would allow for completion of the desired mixed-income housing, strengthen the area, and allow the 1331 property to be used in a manner consistent with the Redevelopment Plan. The city council subsequently approved the Commission's recommendation and passed an ordinance authorizing the City's corporation counsel to negotiate for the purchase of the 1331 property and, if unsuccessful, to initiate condemnation proceedings to acquire title to the property. The City was unable to negotiate for the purchase of the 1331 property and therefore sought to acquire it by filing a condemnation action against ANB on July 15, 1999 (the 1331 litigation).

During the pendency of the 1331 litigation, a problem arose in that acquisition of the 1331 property would have left the 1332 building without its required off-site parking. The City determined it was necessary to replace that parking because it had facilitated the commercial redevelopment of the 1332 building and because, in order to continue that commercial use, City zoning laws and the special use permits required the 1332 building to maintain its accessory parking. The Commission ultimately concluded that the most appropriate substitute property was the Midland Property, located immediately south of the 1332 building. The Midland Property

was selected because of its proximity to the 1332 building and because switching the parking location for the 1332 building from the east to the west side of Halsted Street would help separate commercial uses from residential uses. The Commission also noted that the Midland Property was currently being used as a commercial parking lot and was zoned M2-5 "General Manufacturing District," that the City was in the process of amending the land use to "Residential and Parking[1]," and that providing for parking on the Midland Property would therefore be consistent with the proposed land uses of property in the Redevelopment Area. The Commission further noted that acquisition of the Midland Property would meet the design objectives of the Redevelopment Plan and would allow for the existing parking lot used by the 1332 building to be redeveloped as part of the North Town Village Project, thereby fulfilling the objectives of the Near North Redevelopment Initiative.

The parties in the 1331 litigation ultimately reached an agreement regarding compensation for the City's acquisition of the 1331 property, which they presented to the circuit court in a stipulation for judgment. That stipulation was reflected in a judgment order entered by the court on January 24, 2000, in which the court ordered the City to pay $2,793,322 as just compensation for the taking of the 1331 property. The order also contained provisions reflecting the parties' agreement that acquisition of the 1331 property would damage the 1332 building by eliminating its off-site parking facility. The court ordered the City, as compensation for the lost parking, to acquire the northern 12,500 square feet of the Midland Property upon the City taking possession of the 1331 property, to rezone that property to conform to the zoning of the 1332

---

[1]The city council passed the amendment regarding the land use on November 3, 1999.

building, to deliver the parking lot in full code compliance, and then, within 24 months of the date of the court's order, to convey that property to ANB. The order also required the City to make all reasonable efforts to acquire the southern 12,500 square feet of the Midland Property and gave ANB the option to purchase that property. Finally, the court ordered ANB to deliver possession of the 1331 property, except for the 10,500 square feet currently used for parking (the parking site), to the City by February 1, 2000, and to deliver possession of the parking site upon execution of the lease for the northern 12,500 square feet of Midland's property.

On April 18, 2000, the circuit court entered an agreed amended judgment order. The amended order required the City to acquire the Midland Property and convey it to ANB "in order to mitigate damages to the remainder including lost parking." The order further specified that the northern 12,500 square feet of Midland's property would be acquired and conveyed to ANB as set forth in the court's order dated January 24, 2000, and that the southern 12,400 square feet of Midland's property would be acquired by January 24, 2002. The order further required ANB to deliver possession of the parking site to the City by April 18, 2000. The City was required to provide valet parking for the tenants and clients of the 1332 building from April 17, 2000, until May 1, 2000. Finally, the order provided that effective May 1, 2000, the City would rent 30 parking spaces to ANB in the parking lot located on the northern portion of the Midland Property in lieu of its obligations to lease the northern 12,500 square feet of that property. This rental arrangement was to continue until January 24, 2002, or until the City conveyed the Midland Property to ANB, whichever was earlier.

The City and Midland subsequently entered into a lease from April 2000 through March

31, 2002, under which Midland provided 30 parking spaces to the City in the northern portion of the Midland Property. The lease ran from April 2000 through March 2002 and provided that any holdover by the tenant created a month-to-month tenancy. After entering that lease, the City subleased the parking spaces to the owner of the 1332 building.

Meanwhile, in 1999 and 2001, the city council passed ordinances authorizing the City to acquire the Midland Property. The ordinances provided that the Midland Property was to be acquired in order to further the Redevelopment Plan by eradicating blight and by allowing underutilized land to be redeveloped for residential uses. The ordinances further provided that the City had previously acquired the 1331 property in order to construct a mixed-income residential development known as the North Town Village Project, that a portion of that property had previously been used, pursuant to a special use permit, as off-site parking for the 1332 building, and that the judgment orders entered in the 1331 litigation obligated the City to acquire Midland's property as a replacement parking site in mitigation of damages to the owner of the 1332 building and to then convey that property to the owner of 1332 building by January 24, 2002. The ordinances also recited that the acquisition and conveyance of the Midland Property was for a public purpose "consistent with those public purposes set forth in the Redevelopment Plan" such that the acquisition of the Midland Property was "in furtherance of the commercial and business redevelopment of the Redevelopment Area."

On January 2, 2002, the City filed a complaint to condemn the Midland Property. Midland responded by filing a traverse and motion to dismiss, arguing, among other things, that the condemnation was an unnecessary and excessive taking of property for private use.

1-07-3200

On July 21, 2003, the circuit court, after hearing witness testimony and reviewing the documents submitted into evidence by the parties, granted Midland's traverse and motion to dismiss.[2] The court began its order by stating that "[d]espite the City's attempt to amend its Complaint to conform to the pleadings, this Court finds the City has failed to do so in its entirety. However, since this is a matter the City can correct, the Court will continue with its decision based on the testimony and documents presented at the hearing." The court then found that the City had not abused its discretion in determining that it was necessary to acquire the Midland Property and that, under the facts of the case, the use of substitute condemnation was appropriate. The court noted that the evidence established that taking the northern portion of Midland's property was substitute property for the parking loss to the 1332 building, that substitute condemnation was the best method of making the 1332 building whole, and that acquiring that portion of Midland's property was closely connected with the acquisition of the 1331 property for the mixed-income residential development and was necessary to allow the City to carry out the public project. The court also found, however, that the City abused its authority by seeking to condemn all of the Midland Property because only the northern 12,500 square feet were necessary to replace the 30 parking spaces lost by the 1332 building and taking the southern 24,000 square feet was excessive and would benefit only the private owner of the 1332 building. For these reasons, the court dismissed the action.

On August 14, 2003, the City filed a motion requesting that the circuit court, rather than

---

[2]Although the circuit court's order indicates that the court heard testimony on Midland's traverse and motion to dismiss, and the parties' pleadings indicate that the court held evidentiary hearings on the motion, the record does not contain a transcript of those proceedings.

9

dismiss the action, modify its judgment to reflect that acquisition of the northern portion of the Midland Property was proper and could proceed. The court denied the City's motion without comment.

In response to the court's ruling, on December 17, 2003, the city council passed an ordinance authorizing the City to acquire the northern portion of the Midland Property located at 1324 to 1328 North Halsted. The ordinance stated that in the previous action seeking to acquire the Midland Property the circuit court found that the acquisition was within the City's authority except that the taking was excessive and that it was therefore "necessary to enact a technical correction to the authority to condemn in order to conform the taking to the findings of the court." The ordinance also recited that it remained useful, necessary and desirable to acquire the Midland Property for the same reasons set forth in the previous ordinances authorizing acquisition of that property. The ordinance further provided that the city council found it necessary for the City to establish and continue its right to have vehicles park on the Midland Property, that the right to have vehicles park on the Midland Property was uncertain because the lease permitting the City to do so had expired, and that it was necessary and in the best interests of the City to secure "said right to park immediately."

The City was unsuccessful in its attempt to acquire the northern portion of the Midland Property by agreement and therefore filed the present condemnation action on May 19, 2004.[3] Midland responded by filing a traverse and motion to dismiss, arguing that the condemnation was

---

[3]The initial action seeking to condemn the Midland Property was assigned to Judge Joanne L. Lanigan. The present condemnation action seeking to acquire the northern portion of the Midland Property was assigned to Judge Sheldon Gardner.

barred by *res judicata* because the City could have sought to acquire only the northern portion of the Midland Property in the prior lawsuit. Midland also argued that the taking was improper because it was intended solely to benefit the private owner of the 1332 building. Midland further asserted that the taking was unnecessary because no declared public purpose was involved, because the 1332 building's parking need was being satisfied by use of the northen portion of the Midland property under sublease from the City, and because other parking lots were available.

The circuit court decided to initially resolve the issues of *res judicata* and collateral estoppel and issued its order on November 8, 2006.[4] The court began by noting that the previous action seeking to condemn the Midland Property had been dismissed as an excessive taking and that the City had refiled the action with a reduction in the amount of property sought to "address the defect this Court previously found." The court also noted that because Midland had again filed a traverse and motion to dismiss, the court was "now left with the unenviable task of interpreting the previous rulings of Judge Lanigan." The court then made the following ruling regarding the issue of *res judicata*:

> "1. Implicit in this Court's previous rulings under Judge
>
> Lanigan was the right of the City to cure its defect of an excessive
>
> taking by reducing the amount of property to be acquired.

---

[4] On May 1, 2006, the court entered an order stating that it had heard arguments on the issues of collateral estoppel and *res judicata* and that the court's opinion would be available on June 8, 2006. No transcripts from that hearing are included in the record. A subsequent court order, dated July 25, 2006, states that additional arguments on *res judicata* would be heard on August 1, 2006. There is no indication if those arguments were held and no transcript of those proceedings is included in the record.

2. The City has complied with this Court's previous ruling and reduced the amount of land to be acquired through the passing of a new ordinance.

3. Midland challenges the new ordinance on the basis of *res judicata*. This Court finds that the amount of land to be taken is different from the first suit, and that the initial ordinance is an irregular exercise of existing power and did not have to do with the City lacking the power to pass the ordinance. Thus, this Court concludes as Judge Lanigan indicated throughout her order that the City retained the right to cure the defect in its initial ordinance and *res judicata* does not apply."

The court heard additional arguments on the issue of collateral estoppel and subsequently ruled that the doctrine did not apply because it would have been inequitable for Midland to have ultimately prevailed on the earlier motion to dismiss and yet have lost all of its rights to appeal the issues decided against it in that motion.

The parties submitted additional memoranda on the remaining issues raised in Midland's traverse and motion to dismiss, and the court issued its judgment on September 20, 2007. The court began by noting that the prior action was dismissed on the grounds that the taking was excessive and that, "[i]nstead of allowing the City to amend its complaint and cure its defect, the City was forced to file a new condemnation action concerning the exact same subject matter that is at issue before this Court minus the defect." The court then found that the City had established

12

a *prima facie* case of the authority, purpose and necessity for the acquisition of the Midland Property. Accordingly, the court noted that the burden shifted to Midland to show that there was an abuse of discretion by the City. According to the court, the primary issue was whether Midland's property was being taken for a valid public use through the use of substitute condemnation. The court noted that under the United States Supreme Court's decision in *Brown v. United States*, 263 U.S. 78, 68 L. Ed. 171, 44 S. Ct. 92 (1923), a condemning authority may condemn private property from third persons in order to compensate an owner whose property is taken for a public project so long as the substitute property fulfills a public purpose, and that the relevant inquiry is whether the substitute land is "closely connected to the acquisition of the district *** and *** necessary to carrying out the project." The court found that the acquisition of Midland's property for the mixed-income residential development was closely connected and necessary to allow the City to carry out a public project, noting that the evidence established that Midland's property would be taken as substitute property for the parking lost by the 1332 building when the City acquired the 1331 property as part of the North Town Village Project. For these reasons, the court found that "the City has the authority, proper public use and purpose, and necessity to acquire the subject property by eminent domain" and therefore denied Midland's traverse and motion to dismiss.

On November 8, 2007, the circuit court made a finding pursuant to supreme court rule 308(a) (155 Ill. 2d R. 308(a)) that its order denying Midland's traverse and motion to dismiss involved two questions of law as to which there were substantial grounds for difference of opinion and that an immediate appeal might materially advance the ultimate termination of this

litigation. The court certified the following questions: (1) whether the present action is barred by *res judicata* based upon the judgment entered in the previous action seeking to condemn the Midland Property; and (2) whether the City's proposed taking of Midland's property is a proper exercise of the City's power of eminent domain. On November 21, 2007, Midland filed a petition for leave to appeal pursuant to Rule 308(a) and a motion to stay the trial court proceedings pending resolution of that appeal. On December 12, 2007, this court granted Midland's petition for leave to appeal.

Because this appeal involves two questions of law certified by the trial court pursuant to Supreme Court Rule 308, our review of each question is *de novo*. *In re M.M.D.*, 213 Ill. 2d 105, 113 (2004). *De novo* review is also warranted because the trial court did not hear testimony in this case and answered each question based solely on documentary evidence and because, on appeal, the material facts are not in dispute. See *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 154 (2007); *Department of Transportation v. Hunziker*, 342 Ill. App. 3d 588, 593 (2003).

The first issue is whether the present action is barred by *res judicata*.

"The doctrine of *res judicata* provides that a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action." *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467 (2008). *Res judicata* acts as a bar to litigation of all issues that were actually decided and of all issues that could have been raised and decided in the earlier action. *Arvia v. Madigan*, 209 Ill. 2d 520, 533 (2004). The essential elements of *res judicata* are: (1) a final judgment on the merits rendered by a court of competent jurisdiction; (2) an identity of causes of action; and (3) an identity of parties

1-07-3200

or their privies. *Hudson*, 228 Ill. 2d at 467.

In this case, the parties agree that there was a final judgment on the merits rendered by a court of competent jurisdiction in the original condemnation action and that there is an identity of parties in that action and the present one. The issue is whether the two cases involve the same cause of action.

In order to resolve this issue, it is necessary to understand the nature of the dismissal of the prior lawsuit in which the City sought to acquire all of the Midland Property. To do so, we must interpret the court's order dismissing that lawsuit as well as the court's subsequent denial of the City's posttrial motion. We note that the trial court in this case interpreted those orders to mean that implicit in the court's dismissal of the prior action was the right of the City to cure the defect in its initial ordinance by reducing the amount of property to be acquired.

In the judgment dismissing the prior lawsuit, the court began by stating that "[d]espite the City's attempt to amend its complaint to conform to the pleadings, this Court finds the City has failed to do so in its entirety. However, since this is a matter the City can correct, the Court will continue with its decision based upon the testimony and documentation presented at the hearing." The court then considered Midland's arguments that the taking was excessive and not for a public use.[5] The court found that the use of substitute condemnation was appropriate under the unique facts of the case. The court stated that acquiring the northern portion of the Midland Property was the best method of making the 1332 building whole by providing it with substitute

---

[5]According to the court, Midland's argument that the taking was not for a public purpose was based on testimony provided by the City which established that the public would not be entitled to use the Midland Property after the taking.

15

property for the parking loss that the building incurred. The court further stated that acquiring the northern portion of the Midland Property was closely connected to the acquisition of the 1331 property for the mixed-income residential development and was necessary to allow the City to carry out the public project. The court, however, ultimately dismissed the action because the City was attempting to acquire all of the Midland Property and, according to the court, acquiring the southern portion of that property was excessive and benefitted only the private owner of the 1332 building.[6] The trial court's ruling was later summarized in a memorandum dated November 12, 2003, from Alicia Berg, commissioner of the Department of Planning, to Joan Cogan, assistant to the mayor, Jeffrey Levine, chief assistant corporation counsel, and Russell Carlso, first deputy budget director. According to the memorandum, the trial court dismissed the taking because the area to be taken accommodated approximately 60 vehicles while only an area with a capacity to accommodate 30 vehicles was needed. The memorandum further states that when the City sought to limit the taking to 30 vehicles, the court determined that the authority granted by the city council ordinances did not permit it to do so because the ordinances authorized the acquisition of the whole parcel and not a smaller portion of the whole.

Based upon the court's statement regarding the "City's attempt to amend its complaint to conform to the pleadings," it is clear that the City sought to amend its complaint to conform to the proofs prior to the court entering its judgment dismissing the case. Based upon the record, it is reasonable to infer that the City sought to amend its complaint in order to acquire only the

---

[6]The court relied on testimony establishing that the northern portion of the Midland Property could accommodate the 30 parking spaces which the 1332 building required prior to the acquisition of the 1331 property.

northern portion of the Midland Property, which the court found was necessary to replace the parking lost by the 1332 building. It is also reasonable to infer that the court found that the City could not seek only that amount of land without a new ordinance because the ordinances passed by the city council at that time only authorized the City to acquire all of the Midland Property. Finally, based upon the court's statement that it would continue with its ruling because the City could "correct" that "matter," it is reasonable to infer that the court denied the City's request to amend its complaint and ultimately dismissed the case with the intention of reserving the City's right to file a complaint for half of the Midland Property after it had obtained an ordinance allowing it to do so.[7] Having so interpreted the court's order dismissing the prior lawsuit, we now consider whether the two cases involve the same cause of action.

Illinois courts apply the "transactional test" to determine whether there is an identity of causes of action. *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 309 (1998). Under this test, "separate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief." *River Park*, 184 Ill. 2d at 311. Thus, in determining whether two suits constitute the same cause of action under *res judicata*, the court considers the facts that gave rise to the claim for relief and not simply to the facts which support the judgment in the first action. *Stillo v. State Retirement Systems*, 366 Ill. App. 3d 660, 663 (2006), citing *River Park*, 184 Ill. 2d at 309-10.

---

[7]We also note that the City subsequently filed a posttrial motion asking the court to amend its judgment to allow the City to proceed with acquiring half of the Midland Property. The court denied the motion and the record does not reveal the basis for this denial.

Our research has revealed few cases in which the applicability of *res judicata* has been considered in context of the factual situation that is present in this case. Nevertheless, several courts have considered issues similar to the one present in this case.

For example, in *County of Wabash v. Partee*, 241 Ill. App. 3d 59 (1993), the court was required to decide whether two attempts to acquire the same piece of property involved the same cause of action for purposes of determining whether the case was barred by *res judicata*. In that case, the City of Mt. Carmel, in a prior lawsuit, had sought to condemn land outside of its city limits for highway purposes so that traffic could exit the highway and travel directly to a nearby college. *County of Wabash*, 241 Ill. App. 3d at 62. The supreme court affirmed the dismissal of that action because, contrary to the requirements of the Illinois Municipal Code, the property to be taken was not substantially adjacent and contiguous to the incorporated parts of the city. *County of Wabash*, 241 Ill. App. 3d at 62, 64. Subsequently, the city and Wabash County entered into an intergovernmental agreement whereby the city and the county exchanged jurisdiction of certain property so that the county could proceed to complete a county highway. The property involved in the intergovernmental agreement was the same property involved in the former lawsuit. *County of Wabash*, 241 Ill. App. 3d at 62. On appeal, the court then noted that 10 years had passed since the first action and that circumstances had changed in that a distinct and separate entity was seeking to condemn property under an entirely different ordinance. *County of Wabash*, 241 Ill. App. 3d at 65. The court further noted that in that case, unlike in the previous lawsuit, neither the jurisdiction of the city nor the location of the property in relation to the city was at issue and that the only commonality between the two cases was the respondents and the

18

1-07-3200

property. *County of Wabash*, 241 Ill. App. 3d at 65-66. The court therefore concluded that *res judicata* did not apply.

In *Oakes Municipal Airport Authority v. Wiese*, 265 N.W.2d 697 (N.D. 1978), the plaintiff filed a condemnation to acquire approximately 74 acres of defendant's property to construct an airport. The circuit court dismissed the action because the plaintiff had failed to establish the public use, public necessity, and proper selection of the property. Approximately eight months after the case was dismissed, the plaintiff filed another condemnation action seeking to acquire approximately 37 acres of defendant's property for the airport. The district court found that the second condemnation action was barred by *res judicata* and dismissed the case.

On appeal, the Supreme Court of North Dakota began by discussing the difficulty applying *res judicata* to successive condemnation actions seeking to acquire a portion of the same land:

"Although the doctrine of *res judicata* applies to condemnation actions, the doctrine is not readily applicable to those cases in which a condemning authority seeks to bring a second condemnation action to acquire a part of the same land for which the courts in a prior condemnation action against the same party determined that the condemning authority had failed to prove a public use or public necessity. Those cases possess a unique character to which the doctrine is not readily applied in that, as

19

time passes from the entry of the judgment in a condemnation action, changes may occur which would add new and important factors to be considered in a determination of whether a proposed taking in a subsequent action is for a public purpose and whether the particular land sought is necessary for that public purpose. The change in circumstances may present an entirely new case for determination even though the same issues involving public use and public necessity had been determined in a prior condemnation action between the same parties involving the same land." *Oakes Municipal Airport Authority*, 265 N.W.2d at 700.

The court noted that although there was little case law regarding the applicability of *res judicata* to the facts before it, existing authorities indicated an adherence to the following rule: "A prior unsuccessful attempt to acquire property for a public purpose should not bar the commencement of a subsequent action to acquire the same land providing the court is satisfied that the subsequent action was brought in good faith and that there has been a change in circumstances such that the action is not merely an attempt to relitigate identical issues based upon identical factors for consideration." *Oakes Municipal Airport Authority*, 265 N.W.2d at 701. The court stated that the land being sought in the second action was approximately half of that sought in the first action and that the reduction in the amount of land sought could have a decisive impact on a redetermination of whether the taking was necessary. *Oakes Municipal Airport Authority*, 265 N.W.2d at 701. The court further noted that the second action was

brought eight months after entry of judgment in the first action and that, from that mere passage of time, changes in the use and requirements of an airport facility could occur which would affect the determination of whether the proposed taking was necessary. *Oakes Municipal Airport Authority*, 265 N.W.2d at 701. The court concluded that *res judicata* did not apply to the second action and that allowing that action to proceed would not compromise the public policy of precluding the relitigation of settled issues. *Oakes Municipal Airport Authority*, 265 N.W.2d at 701.

Similarly, in *City of Charlotte v. Rousso*, 82 N.C. App. 588, 346 S.E.2d 693 (1986), the North Carolina Court of Appeals considered whether *res judicata* applied to bar the City of Charlotte's attempt to condemn the defendants' property for a public park. The defendant argued that the lawsuit was barred by *res judicata* based upon a judgment which dismissed a prior suit by the city to condemn that same land. The court found, however, that the case was not barred by *res judicata* because it was not based upon the same facts as was the prior suit. *City of Charlotte*, 82 N.C. App. at 589, 346 S.E.2d at 694. The court noted that the first proceeding was based upon a plan to lease some of the condemned land to private parties for use in retail business and that the trial court had correctly dismissed that action because it lacked a public purpose. *City of Charlotte*, 82 N.C. App. at 589, 346 S.E.2d at 694. The court then found that the basis for the case before it was different because after the prior action was dismissed, the city's governing body rescinded the resolution that it was based upon and adopted a new condemnation resolution that was "free of the illegal taint that caused the earlier case to fail." *City of Charlotte*, 82 N.C. App. at 589, 346 S.E.2d at 694. The court concluded that the prior judgment operated as a bar

only as to the facts in existence when the judgment was rendered and therefore held that the prior action barred the city's attempt to condemn the defendants' land for commercial or business purposes but that the prior action did not bar the city from condemning the land for the sole purpose of using it as a park. *City of Charlotte*, 82 N.C. App. at 589, 346 S.E.2d at 694.

While these cases do not involve precisely the same factual situation that is present in this case, they nevertheless suggest the difficulty in apply *res judicata* to successive eminent domain proceedings in which a governing body seeks to acquire a portion of the same land that it had sought in a prior proceeding. Moreover, we believe the authorities discussed above strongly suggest that *res judicata* does not act as a bar to the present condemnation action.

In this case, as in those discussed above, we find that the two lawsuits do not involve the same cause of action because they are each based on a different set of facts. Initially, the two cases were brought pursuant to different ordinances. The first lawsuit against Midland was brought pursuant to a city council ordinance which authorized the City to acquire approximately 25,000 square feet of land, or all of the Midland Property. After that action was dismissed as an excessive taking, the city council passed a new ordinance which authorized the City to acquire only 12,500 square feet of land, or approximately half of the Midland Property. Thus, the two cases are based upon substantively different ordinances and the ordinance giving rise to the present case is an additional fact that did not exist at the time of the initial lawsuit. See *Altair Corp. v. Grand Premier Trust & Investment, Inc.*, 318 Ill. App. 3d 57, 62 (2000) (noting that the facts as they exist at the time of judgment determine whether *res judicata* bars a subsequent action); *City of Charlotte*, 82 N.C. App. at 589, 346 S.E.2d at 694. Moreover, although the two

actions involve the same piece of land, the requested taking in the second action is only for approximately half of the amount of land sought in the first action. Given that the initial action was dismissed as an excessive taking, this reduction in the amount of land sought is a changed circumstance that could have a decisive impact on the trial court's redetermination of whether the taking was necessary. See *Oakes Municipal Airport Authority*, 265 N.W.2d at 701. Finally, an additional issue that was critical to the court's dismissal of the prior lawsuit is not present in this case. When the City sought to limit its taking in the prior lawsuit, the court did not rule that the City had failed to establish the necessity and public purpose for acquiring half of the Midland Property in order to provide the 1332 building with substitute parking. Rather, the court found that the City could not seek to acquire that amount of property at the time because the ordinance passed by the city council authorized the City only to acquire all of the Midland Property. The issue of the City's authority, however, is not present in this case because the City obtained an ordinance authorizing it to acquire half of Midland's property. See *County of Wabash*, 241 Ill. App. 3d at 65-66. For all of these reasons, we conclude that an identity does not exist between the causes of action asserted in the two proceedings and, accordingly, *res judicata* does not bar the present case.

Midland nevertheless argues that the present action is an impermissible collateral attack on a prior judgment. Specifically, Midland claims that it was only after the trial court dismissed the initial action that the City attempted to have that judgment amended to allow it to acquire half of the Midland Property. Midland then points to the trial court's statement in this case, made in its order denying Midland's motion to dismiss, that "[i]nstead of allowing the City to amend its

23

complaint and cure its defect, the City was forced to file a new condemnation action concerning the exact same subject matter that is at issue before this Court minus the defect." Midland argues that the court's refusal to amend its judgment in the initial action did not "force" the City to bring the present action and that the City could have appealed the judgment entered against it, which would have included the denial of its motion for leave to amend the judgment. Midland concludes that, by failing to appeal, the City waived its right to challenge the court's denial of its motion for leave to amend and that the present action is therefore a collateral attack on the judgment dismissing the prior condemnation action. We find this argument unpersuasive.

We initially note that, contrary to Midland's argument, the record suggests that the City's attempt to amend its complaint was distinct from its posttrial motion. In its judgment dismissing the initial action, the court referred to the "City's attempt to amend its complaint to conform to the pleadings." The City's posttrial motion, however, did not seek to amend its *complaint* but, rather, requested that the court amend its *judgment* to reflect that the City's acquisition of the northern portion of the property was proper and could proceed. Moreover, the judgment dismissing the initial action, in which the court made the statement regarding the City's attempt to amend its complaint, was entered on July 21, 2003, approximately three weeks before the City filed its posttrial motion on August 14, 2003, requesting that the court amend its judgment.

Regardless, the present case is not a collateral attack on the judgment entered in the prior lawsuit. "A collateral attack on a judgment is an attempt to impeach that judgment in an action other than that in which it was rendered." *Thomas v. Sklodowski*, 303 Ill. App. 3d 1028, 1033 (1999).

By arguing that the trial court's refusal to amend its judgment in the first lawsuit did not force the City to bring the second action because the City could have appealed the denial of its motion for leave to amend, Midland assumes that the court's reason for denying the City's motion was incorrect and that the City could have obtained relief in the appellate court. However, no such relief would have been available. Although the trial court in the first lawsuit did not articulate its basis for denying the City's motion, it is reasonable to assume, consistent with the court's reason for denying the City's request to amend its complaint, that the court did so because the City lacked an ordinance authorizing it to acquire only half of the Midland Property. Thus, the court believed that the City could only seek to acquire the amount of land authorized by the ordinance. We find no error in the trial court's judgment in this respect.

A public body generally manifests its intention to exercise the power of eminent domain by an enabling ordinance or resolution. *Forest Preserve District of DuPage County v. Miller*, 339 Ill. App. 3d 244, 253-54 (2003). The enabling ordinance must reasonably describe the property to be taken, and the failure to so describe the property is fatal to the petition to condemn. *Illinois State Toll Highway Authority v. DiBendetto*, 275 Ill. App. 3d 400, 405 (1995); see also *City of Rockford v. Rockford Insurance Co.*, 16 Ill. 2d 287, 289 (1959) (rejecting argument that enabling ordinance need not describe the property to be taken and noting that the record did not show that prior to filing the eminent domain petition, the city council determined, by ordinance or resolution, what land was to be taken or "delegated, or attempted to delegate, to anyone else the power to make that determination"); *Forest Preserve District of DuPage County*, 339 Ill. App. 3d at 255 (noting that the decision in *City of Rockford* "suggests that stringent standards

25

should be applied to the requirement of an enabling ordinance that describes the property to be condemned"). Additionally, ordinances enabling the appropriation of private property are in derogation of the common law and thus must be strictly construed. *Forest Preserve District of DuPage County*, 339 Ill. App. 3d at 255.

In this case, the enabling ordinance specifically authorized the City's Corporation Counsel to acquire all of the Midland Property. Nothing in the ordinance could reasonably be construed as giving the Corporation Counsel discretion or authority to seek less than that amount of land. Given the specific language of the enabling ordinance, requesting that the court award the City half of the Midland property was essentially asking the court to amend and add language to the ordinance passed by the City Council. Under these principles, we cannot presume that legislative authorization for a more extensive taking under eminent domain implicitly authorizes a lesser taking so as to obviate the need for a new ordinance or resolution. In point of fact, the purpose for and impact of the exercise of eminent domain may change with a decrease as much as with an increase so as to require new legislative evaluation and authorization. Midland has cited to no case law, nor are we aware of any, which suggests that the court would have had the authority to permit such an amendment to the ordinance or to otherwise allow the City to seek less than the amount of land that the ordinance authorized it to acquire. Under these circumstances, we would not have reversed the trial court's denial of the City's posttrial motion and allowed the City to proceed with acquiring half of the Midland property in the first lawsuit. Accordingly, we find no error in the trial court's statement in this case that the court's refusal to amend its judgment necessitated the City obtaining a new ordinance and filing the present

condemnation action.

Moreover, although Midland argues that the City waived its right to challenge the court's denial of its motion for leave to amend in the first lawsuit, the record shows that the present lawsuit was not filed in an attempt to challenge that denial but instead was actually brought pursuant to the court's judgment in the prior lawsuit. As noted, in the prior lawsuit the City originally sought to acquire all of the Midland Property and then sought to limit the taking to half of that property. The trial court ruled, however, that the City lacked an ordinance authorizing it to acquire that amount of land and dismissed the action with the intention of reserving the City's right to obtain a new ordinance and file a complaint for half of the Midland Property. The present case is therefore not an attempt by the City to "impeach" the court's judgment in the first action but, rather, was filed specifically pursuant to that judgment.

For all of these reasons, we find that the present action is not an impermissible collateral attack on the judgment entered in the first lawsuit and that *res judicata* does not apply to the present case.

Moreover, even if we were to find that an identity exists between the causes of action asserted in the two proceedings and that the threshold requirements of *res judicata* were therefore met, it is well settled that *res judicata* is an equitable doctrine that should only be applied as fairness and justice require. *Murneigh v. Gainer*, 177 Ill. 2d 287, 299 (1997); *Yorulmazoglu v. Lake Forest Hospital*, 359 Ill. App. 3d 554, 563 (2005). The doctrine is designed to prevent a multiplicity of lawsuits between the same parties where the facts and issues are the same. *Murneigh*, 177 Ill. 2d at 299. "*Res judicata* promotes judicial economy by preventing repetitive

litigation and [additionally] protects parties from being forced to bear the unjust burden of relitigating essentially the same case." *Arvia*, 209 Ill. 2d at 533. Equity dictates that the doctrine of *res judicata* should not be technically applied if to do so would be fundamentally unfair or would create inequitable or unjust results. *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 390 (2001); *Best Coin-Op, Inc. v. Paul F. Ilg Supply Co.*, 189 Ill. App. 3d 638, 650 (1989). Moreover, *res judicata* does not bar a subsequent action where the court in the earlier action expressly reserved the plaintiff's right to maintain the second action. *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 341 (1996); *Nowak*, 197 Ill. 2d at 392-93; Restatement (Second) of Judgments §26(1)(b) (1982). _____

Given the unique facts and procedural history of this case, we believe it would be fundamentally unfair to apply *res judicata* as a bar to the City's attempt to acquire the northern portion of the Midland Property. Midland's primary argument as to why *res judicata* should apply is that the City could have sought to acquire the northern portion of its property in the initial condemnation action. However, the City clearly attempted to do so in its posttrial motion and, as previously noted, it is reasonable to infer the City also sought to do so when it attempted to amend its complaint to conform to the proofs. The court, however, did not permit the City to do so because, while the City had established the necessity and public purpose for acquiring half of the Midland Property, the court found that the City lacked an ordinance authorizing it to acquire less than all of the Midland Property. The court thus dismissed the action with the intention of allowing the City to obtain a new ordinance and file a complaint for half of the Midland Property. The record thus establishes that this is not a case in which the City has filed a

multiplicity of lawsuits or simply refiled the same lawsuit that was previously dismissed in hopes of obtaining a different result.  Rather, the record establishes that the City brought the present action in good faith and specifically pursuant to the court's order dismissing the prior lawsuit. To apply *res judicata* under these circumstances would be to ignore that the City sought to acquire half of Midland's property in the initial action and would effectively punish the City for its reliance upon the court's ruling.  This would be an unjust and technical application of the doctrine of *res judicata* and we therefore decline to apply it to this case.

The second issue on appeal is whether the present action is a proper exercise of the City's power of eminent domain.

Both the Illinois Constitution and the fifth amendment of the United States Constitution prohibit the taking of private property for a public purpose without payment of just compensation.  Ill. Const. 1970, art. I, §15; U.S. Const., amend. V.  Additionally, section 7-101 of the Code of Civil Procedure provides, "[p]rivate property shall not be taken or damaged for public use without just compensation."  735 ILCS 5/7-101 (West 2004).[8]

Midland challenges the City's attempt to acquire its property on the ground that the taking is unnecessary.  Midland first asserts that the taking is unnecessary because there are other means by which the City can provide the necessary parking for the 1332 building.  Midland specifically

---

[8]The citation given is to the version of the Eminent Domain Act that was in effect at the time this action was litigated.  Since then, the entire Act has been repealed (Pub. Act 94-1055, eff. January 1, 2007) and subsequently reenacted and recodified (see 735 ILCS 30/1-1-1 *et seq*. (West 2006)).

claims that since 2000 it has been leasing the northern portion of its property to the City, which has in turn subleased that property to the owner of the 1332 building and that this arrangement replaced the parking lost when the 1331 building was developed. Midland further claims that it has offered to make parking on its land available to the 1332 building for so long as Midland owns the property. Accordingly, Midland concludes that there is a "far less drastic alternative" available than condemning its property and that the City's attempt to acquire its property is therefore unnecessary.

When a condemnation action is filed, a landowner may challenge it by filing a traverse and motion to dismiss. *Village of Cary v. Trout Valley Ass'n*, 282 Ill. App. 3d 165, 169 (1996). When such a motion is filed, the condemning authority bears the initial burden of establishing a *prima facie* case as to any disputed allegations. *City of Chicago v. First Bank of Oak Park*, 178 Ill. App. 3d 321, 327 (1988); *Village of Round Lake v. Amann*, 311 Ill. App. 3d 705, 712 (2000). However, the introduction into evidence of a valid ordinance reciting the necessity for taking private property for a public purpose establishes a *prima facie* case authorizing the acquisition of the property in question, making it the burden of the party challenging the condemnation to come forward with evidence that the condemnor abused its discretion with respect to its decision concerning the necessity of the taking. *Trustees of Schools of Township No. 37 v. First National Bank of Blue Island*, 49 Ill. 2d 408, 414 (1971); *City of Chicago v. Walker*, 50 Ill. 2d 69, 71 (1971); *Alsip Park District v. D & M Partnership*, 252 Ill. App. 3d 277, 284 (1993).

Moreover, the determination of necessity is a legislative function that is entitled to great deference by the trial and reviewing courts. *City of Chicago v. Boulevard Bank National Ass'n*,

293 Ill. App. 3d 767, 779 (1997). As our supreme court has stated, "[t]he general rule is that where the legislature has delegated to a corporation the authority to exercise the power of eminent domain, the corporation has also the authority to decide on the necessity for exercising the right, and its decision will be conclusive in the absence of a clear abuse of the power granted." *City of Chicago v. Vaccarro*, 408 Ill. 587, 597 (1951). Likewise, in *Department of Public Works & Buildings v. Keller*, 61 Ill. 2d 320, 325 (1975), our supreme court held:

> "[W]hether the exercise of the power of eminent domain is necessary or expedient to accomplish an authorized purpose is not a question within the province of the court to determine. The agency on which the power has been conferred also has the authority to decide the necessity for its exercise. In the absence of a clear abuse of this authority the courts will not inquire into the necessity or the propriety of its exercise."

See also *Alsip Park District*, 252 Ill. App. 3d at 284 ("In Illinois, the issue of whether the exercise of the power of eminent domain is necessary and sufficient to justify the taking of private property for a public purpose is not a judicial question, but instead constitutes a legislative determination that is within a condemnor's discretion").

In this case, Midland has failed to establish that the City abused its discretion with respect to its determination that it was necessary to acquire Midland's property. The City introduced ordinances passed by the city council which authorized it to acquire the northern portion of the Midland Property. The ordinances recited that it was necessary to acquire the Midland Property

31

pursuant to the judgment entered in the 1331 litigation and that it was necessary to acquire the property for the public purpose of furthering the Redevelopment Plan by eradicating blight and redeveloping underutilized land in the Redevelopment Area for residential, commercial, and business uses. The ordinances further recited that it was necessary for the City to establish and continue its right to have vehicles park on the Midland Property, that the right to have vehicles park on the Midland Property was uncertain because the lease permitting the City to do so had expired, and that it was necessary and in the best interests of the City to secure "said right to park immediately." The introduction of these ordinances was sufficient to establish a *prima facie* case of the necessity of acquiring Midland's property. See *Walker*, 50 Ill. 2d at 71; *Alsip Park District*, 252 Ill. App. 3d at 285.

After the City established its *prima facie* case, the burden then shifted to Midland to show that the City abused its discretion on the basis that there were other, less drastic means of providing the necessary parking. To sustain this burden, Midland relies primarily upon the affidavit of its president, Laurence Spector. In that affidavit, Spector stated that on September 1, 2000, Midland leased 30 parking spaces to the City and that, as of March 19, 2007, that lease remained in effect. The affidavit further states that on November 19, 2004, Midland offered to extend the existing lease for so long as Midland owned the property but that the City refused that offer. Attached to affidavit was a copy of the lease and Midland's written offer to the City to extend the lease.

Despite this affidavit, we find that Midland failed to meet its burden of proof. The term "necessary," when used in condemnation proceedings, is subject to a different definition than the

32

term is subject to in common usage. *Boulevard Bank National Ass'n*, 293 Ill. App. 3d at 778. The Illinois Supreme Court has defined necessity with respect to the exercise of the power of eminent domain as meaning " 'expedient,' 'reasonably convenient,' or 'useful to the public,' and [not] limited to an absolute physical necessity. [Citations.] Conversely, the word 'necessary' does not mean 'indispensable' *** or 'an absolute necessity.' " *Department of Public Works & Building v. Lewis*, 411 Ill. 242, 245-46 (1952); see also *Alsip Park District*, 252 Ill. App. 3d at 287. In light of that definition, we do not believe that Midland's offer to continue leasing the property was sufficient to rebut the City's *prima facie* case. At the time the city council passed the ordinance authorizing the taking of the northern portion of the Midland Property, the two-year term of lease for the 30 parking spaces had expired and the parties were operating on a month-to-month tenancy. Midland's offer, made after the City filed the present lawsuit, would not have prevented it from selling the property to another party at a later time, in which case the City would again be required to obtain substitute parking. Moreover, that substitute parking may not be located on or near the Midland Property, which was specifically chosen, in part, due to its unique location adjacent to the 1332 building. Under these circumstances, we cannot say that the City abused its discretion by determining that it was necessary to secure its right to have vehicles park on the Midland Property.

Midland also challenges the City's attempt to acquire its property on the ground that the taking is not for a public use. Midland claims that private property can only be taken for a public use, which requires that all persons must have an equal right to the use, and that in this case, if its property is taken, the new owner would not be required to make parking on the land available to

the public. Accordingly, Midland concludes that the proposed taking of its property contravenes the Illinois and United States Constitutions. Midland relies primarily on our supreme court's decision in *Southwestern Illinois Development Authority v. National City Environmental, L.L.C.*, 199 Ill. 2d 225 (2002) (hereafter *SWIDA*), in support of its claim.

The City, on the other hand, claims that the present case is a proper use of substitute condemnation. The City argues that the taking of the 1331 property, which gave rise to its agreement to acquire the Midland Property, was for the valid public purpose of facilitating the North Town Village Project and that, because that public purpose is so closely connected with the taking of Midland's property, the present action is a constitutional exercise of the City's power of eminent domain. The City relies primarily upon the Supreme Court's decisions in *Brown v. United States*, 263 U.S. 78, 68 L. Ed. 171, 44 S. Ct. 92 (1923), and *Dohany v. Rogers*, 281 U.S. 362, 74 L. Ed. 904, 50 S. Ct. 299 (1930).

In order to properly resolve this issue, it is necessary and helpful to understand the unique nature of what is known as "substitute condemnation." As a general rule, the just compensation required to be given when property is acquired through eminent domain proceedings takes the form of money. However, a situation occasionally arises in which the condemning authority takes land under an agreement to compensate the owner with land taken from a third person instead of money, proceeding then to condemn the third person's land. Such a transaction is called "substitute condemnation" and is generally used in rare circumstances where the owner of land taken for a public use can adequately be compensated only by receiving other adjacent property in exchange. L. Bradshaw, *Substitute Condemnation: Power to Condemn Property or*

1-07-3200

*Interest Therein to Replace Other Property Taken for Public Use*, 20 A.L.R.3d 862 §2[a] (1968).

The quintessential example of substitute condemnation is the United States Supreme Court's decision in *Brown*. In that case, Congress proposed to create a reservoir that would flood three-fourths of a town and authorized the condemnation of adjacent land to which the flooded section of the town could be moved to be united with the remaining one-quarter of the old town. *Brown*, 263 U.S. at 80, 68 L. Ed. at 180, 44 S. Ct. at 93. The plaintiffs were the owners of land that was the object of the condemnation, and they argued that the power of eminent domain did not extend to the taking of one person's property to sell it to another, that such an object could not be regarded as for a public use of the property, and that, without this, the proposed condemnation could not be constitutionally valid. *Brown*, 263 U.S. at 81, 68 L. Ed. at 180, 44 S. Ct. at 93. The Court disagreed, finding that acquisition of the town site was so closely connected with the acquisition of the district to be flooded, and so necessary to the carrying out of the project, that the public use of the reservoir covered the taking of the town site. *Brown*, 263 U.S. at 81, 68 L. Ed. at 180, 44 S. Ct. at 93. The Court pointed out that it would be difficult to fix a proper value of houses in a town to be destroyed where the owners would be unable to find similarly situated in another part of the same town and that if three-quarters of a town, which is a business center and a unit, were destroyed, then all property owners would be injured. *Brown*, 263 U.S. at 81-82, 68 L. Ed. at 180, 44 S. Ct. at 93-94. The Court concluded that it was a natural and proper part of the construction of a dam to provide a substitute town as near as possible to the old town, that compensation by substitution was the "best means of making the parties whole," and that the power of condemnation was necessary to such a substitution. *Brown*, 263

U.S. at 82-83, 68 L. Ed. at 180-81, 44 S. Ct. at 93-94.

The Supreme Court relied upon *Brown* to find that substitute condemnation was proper in *Dohany*. In that case, the state highway commissioner, while engaged in a project to construct and expand a state highway, agreed to include in the highway an adjacent railroad right of way. *Dohany*, 281 U.S. at 364, 74 L. Ed. at 909, 50 S. Ct. at 300-01. To accomplish the inclusion of the railway, the commissioner entered into a contract with the railroad company under which the railway was to be relocated onto land owned by a private party that the commissioner agreed to acquire by purchase or eminent domain. *Dohany*, 281 U.S. at 364, 74 L. Ed. at 909, 50 S. Ct. at 300-01. The plaintiff, who owned the private land upon which the railway was to be relocated, challenged the taking as a violation of due process on the ground that the taking of his land for the purpose of exchange with the railway company was for a private and not a public purpose. *Dohany*, 281 U.S. at 365, 74 L. Ed. at 910, 50 S. Ct. at 301. The Court rejected that argument, finding that it was sufficient that, although the land was to be used as a right of way for a railroad, its acquisition was "so essentially a part of the project for improving a public highway as to be for a public use." *Dohany*, 281 U.S. at 366, 74 L. Ed. at 910, 50 S. Ct. at 301, citing *Brown*, 263 U.S. 78, 68 L. Ed. 171, 44 S. Ct. 92.

Illinois courts have also allowed substitute condemnation. For example, in *Department of Public Works & Buildings v. Bozarth*, 101 Ill. App. 2d 99 (1968), the construction of an interstate was to cause a parcel of property owned by a bank to lose access to a road and thereby become landlocked. *Bozarth*, 101 Ill. App. 2d at 100. The State sought to take a piece of private property from the defendant, an adjacent landowner, in order to provide the land owned by the

36

bank with access to the same road that served its property prior to the interstate construction. *Bozarth*, 101 Ill. App. 2d at 100-01. The defendant filed a traverse and motion to dismiss, arguing that the taking of his property was not for a public use but instead only to aid another private landowner. *Bozarth*, 101 Ill. App. 2d at 100. The court found that, although the acquisition of the property would benefit a private landowner, the taking was nevertheless for a public use because the proposed easement would serve the property for the use of the public just as the public was served by the road leading to the property prior to construction of the interstate. *Bozarth*, 101 Ill. App. 2d at 102. In reaching that conclusion, the court noted that it had considered a similar issue in *Department of Public Works & Buildings v. Koch*, 62 Ill. App. 2d 182 (1965), and that it had observed in that case that it was the right of the public to use, not its exercise of the right, that constituted a valid public purpose. *Bozarth*, 101 Ill. App. 2d at 101.

Despite these authorities, Midland claims that the City's attempt to acquire its property must be declared unconstitutional under our supreme court's decision in *SWIDA*. In that case, SWIDA was a political entity and a municipal corporation whose purpose was to promote economic development in Madison and St. Clair Counties. *SWIDA*, 199 Ill. 2d at 22-28. To that end, SWIDA was empowered to acquire property through the use of eminent domain. In 1996, SWIDA issued $21.5 million in bonds and loaned the proceeds to Gateway to build a racetrack. Due to the racetrack's success, Gateway soon needed additional parking for its customers and thereafter unsuccessfully attempted to negotiate for the purchase of an adjacent tract of land owned by National City Environmental (NCE). *SWIDA*, 199 Ill. 2d at 228-29. Gateway then asked SWIDA to exercise its eminent domain powers to acquire NCE's land and transfer it to

Gateway. *SWIDA*, 199 Ill. 2d at 229-30. SWIDA agreed, citing the numerous benefits to the public health, safety, and general welfare that would come to the region from successful expansion of the racetrack. *SWIDA*, 199 Ill. 2d at 230. SWIDA thereafter acquired the property through quick-take proceedings in the circuit court, but the acquisition was overturned by the appellate court, which found that SWIDA had exceeded its constitutional authority. *SWIDA*, 199 Ill. 2d at 234.

On appeal to the supreme court, SWIDA argued that taking NCE's property was sustainable because it served the public purpose of fostering economic development, promoting public safety, and eliminating blight, and that, in light of these benefits, possessory use by the public was not an indispensable prerequisite to the lawful exercise of the power of eminent domain. *SWIDA*, 199 Ill. 2d at 237. The supreme court disagreed. The court noted that the right of a sovereign to acquire property is limited to takings for a public use, but that the subsequent transfer of property after a taking to private ownership does not by itself defeat the public purpose. *SWIDA*, 199 Ill. 2d at 235. The court further noted that the term "public purpose" was not a static concept but instead was flexible and capable of expansion, but also that this flexibility did not equate to unfettered ability to use eminent domain and that a purely private taking could not withstand the scrutiny of the public use requirement. *SWIDA*, 199 Ill. 2d at 237-38. The court then looked to the true intentions behind the condemnation and to its intended beneficiaries. The court noted that the public was not allowed to use the race track "by right" because a fee was required to be paid to park on the property, and that Gateway could have built the parking on its own property but instead used "SWIDA as its agent to take NCE's property"

because that was the "easier and less expensive avenue." *SWIDA*, 199 Ill. 2d at 241. The court

then stated that while the expansion might reduce parking lines and thereby increase public

safety, this was insufficient to satisfy the public use requirement, particularly in light of evidence

that Gateway could have built the parking garage on its own property. *SWIDA*, 199 Ill. 2d at 238-

39. The court further stated that "[w]hile the activities here were undertaken in the guise of

carrying out its legislated mission, SWIDA's true intentions were not clothed in independent,

legitimate governmental decision to further a planned public use." *SWIDA*, 199 Ill. 2d at 240.

Noting that SWIDA had not studied the parking situation at Gateway and that it had advertised

that, for a fee, it would condemn land at the request of private developers for their private use,

the court opined:

> "Clearly, the foundation of this taking is rooted not in the
>
> economic and planning process with which SWIDA has been
>
> charged. Rather, this action was undertaken solely in response to
>
> Gateway's expansion goals and its failure to accomplish those
>
> goals through purchasing NCE's land at an acceptable negotiated
>
> price. It appears SWIDA's true intentions were to act as a default
>
> broker of land for Gateway's proposed parking plan." *SWIDA*, 199
>
> Ill. 2d at 240-41.

Finally, noting that the expansion would increase Gateway's revenue and thereby bring

additional revenue to the region, the court found that "[u]sing the power of the government for

purely private purposes to allow Gateway to avoid the open real estate market and expand its

facilities in a more cost-efficient manner, and thus maximizing corporate profits, is a misuse of the power [of eminent domain]." *SWIDA*, 199 Ill. 2d at 241. Thus, the court found that SWIDA had exceeded its constitutional authority in taking NCE's land by eminent domain. *SWIDA*, 199 Ill. 2d at 242.

Midland claims that in this case, as in *SWIDA*, a private party is the primary beneficiary of the taking and that any public benefit which might result is purely incidental. Midland asserts that pursuant to *SWIDA* and similar cases, the public must have the right to use the property taken and that, because the new owner of its property would not be required to open the parking to the public or even devote the property's use to parking, "the public would gain nothing from this taking."

Contrary to Midland's argument, we do not believe that the focus of the court's decision in *SWIDA* was on the quantitative measure of the degree to which the public would be entitled to use the property. Rather, we believe the court's decision focused on the motives behind the taking and whether the taking was in fact intended to benefit the public or, rather, to benefit purely private interests. The court ultimately did not believe that SWIDA's motives in acquiring NCE's property were consistent with or based upon its legislated purpose under which it purported to acquire the property. For example, the court noted that "private persons may ultimately acquire ownership of property arising out of a taking and the subsequent transfer to private ownership does not by itself defeat the public purpose." *SWIDA*, 199 Ill. 2d at 235-36, quoting *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 243-44, 81 L. Ed. 2d 186, 199, 104 S. Ct. 2321, 2331 (1984). The court further noted, however, that the issue in SWIDA was "not

\*\*\* the ultimate transfer of property to a private party," but rather "whether SWIDA exceeded the boundaries of constitutional principles and its authority by transferring the property to a private party for a profit when the property is not put to a public use." *SWIDA*, 199 Ill. 2d at 236. Similarly, the court noted that "the taking of slums and blighted areas is permitted for the purposes of clearance and redevelopment, regardless of the subsequent use of the property," but that in that case the court was "not dealing with a taking for the purposes of eliminating slums or blight." *SWIDA*, 199 Ill. 2d at 238. Moreover, as evidence that SWIDA's true motives were to make a profit and to act as a "broker" for Gateway's expansion goals, the court noted that SWIDA had agreed to acquire whatever land Gateway desired for a fee and that Gateway elected to have SWIDA acquire the property because that was the "easier and less expensive" option. *SWIDA*, 199 Ill. 2d at 240-41.

We also do not believe that the decision in *SWIDA* established a bright-line rule regarding the public use requirement. As the court itself noted:

> "We do not require a bright-line test to find that this taking bestows a purely private benefit and lacks a substantial showing of a supporting legislative purpose. As was the case in *Limits Industrial*, members of the public are not the primary intended beneficiaries of the taking. [citation]. This condemnation clearly was intended to assist Gateway in accomplishing their goals in a swift, economical, and profitable manner." *SWIDA*, 199 Ill. 2d at 240.

1-07-3200

It is true that in *SWIDA* our supreme court cited to is previous holding in *Gaylord v. Sanitary District*, 204 Ill. 576, 584 (1903), that: "[t]he public must be to some extent entitled to use or enjoy the property, not as a mere favor or by permission of the owner, but by right." The court also cited to *Gaylord* as having "expressed the long-standing rule that 'to constitute a public use, something more than a mere benefit to the public must flow from the contemplated improvement.'" *SWIDA*, 199 Ill. 2d at 239, quoting *Gaylord*, 204 Ill. at 584. However, our supreme court has qualified and explained the statements made in cases such as *Gaylord*:

> "The sweeping expressions [in *Gaylord*], however, have been restricted to the particular factual situations there involved ***. Numerous decisions of this court clearly demonstrate that possessory use by the public is not an indispensable prerequisite to the lawful exercise of the power of eminent domain. In discussing a similar contention advanced in an attack upon the validity of the Neighborhood Redevelopment Corporation Law, the court said: 'When such areas have been reclaimed and the redevelopment achieved, the public purpose has been fully accomplished. The fact that the act does not thereafter vouchsafe the continued use of the property acquired for public purposes, does not in any way affect the purposes of the act or render the taking of the property a taking for a use or purpose which is not public. The achievement of the redevelopment of slum and blight areas *** constitutes a

42

1-07-3200

public use and a public purpose, regardless of the use to which may

be made of the property after the redevelopment has been

achieved.' " *People ex rel. Gutknecht v. City of Chicago*, 3 Ill. 2d

539, 544-45 (1954), quoting *Zurn v. City of Chicago*, 389 Ill. 114,

129 (1945).

In *SWIDA*, the court itself acknowledged the difficulty in drawing a bright-line test as to

what constitutes a public purpose and that such a determination could vary from case to case:

"It may be impossible to clearly delineate the boundary

between what constitutes a legitimate public purpose and a private

benefit with no sufficient, legitimate public purpose to support it.

'We deal, in other words, with what traditionally has been known

as the police power. An attempt to define its reach or trace its

outer limits is fruitless, for each case must turn on its own facts.' "

*SWIDA*, 199 Ill. 2d at 236, quoting *Berman v. Parker*, 348 U.S. 26,

31-32, 99 L. Ed. 27, 37, 75 S. Ct. 98, 102 (1954).

After carefully considering the authorities relied upon by each party, we conclude that the

present case involves a proper use of substitute condemnation and therefore a constitutional

exercise of the City's power of eminent domain. The purpose of the Clybourn-Ogden

Redevelopment Plan was to eliminate blight and promote economic redevelopment of the area.

There is no dispute that these are valid public purposes under which property may be acquired by

the use of eminent domain, regardless of the use which may be made of the property after the

43

redevelopment has been achieved. See *SWIDA*, 199 Ill. 2d at 238-39; *Gutknecht*, 3 Ill. 2d at 545.

Pursuant to the Redevelopment Plan, the City promoted the commercial redevelopment of the

1332 building. In order to be used for commercial purposes, however, the 1332 building was

required to maintain a certain amount of parking. Because the 1332 building did not have

adequate space for that parking on its property, the City facilitated the commercial

redevelopment and provided the necessary parking by conveying the 1331 property to the 1332

building owner. The City later sought to acquire the 1331 property for another valid public

purpose, the North Town Village Project, which included mixed-income residential homes and

was in furtherance of the redevelopment plan for the area. That taking, however, would have

eliminated the 1332 building's parking and, because the City had facilitated the commercial

redevelopment of that building pursuant to the plan and because the 1332 building was required

by zoning laws to maintain its parking in order to continue its commercial use, the City

determined that it was necessary to provide the 1332 building substitute parking. The City's

Community Development Commission ultimately determined that the northern portion of

Midland's land was the most appropriate substitute property due to its proximity to the 1332

building and because switching the 1332 building's parking from the east to the west side of

Halsted street would separate commercial from residential uses. The agreement to provide the

1332 building with Midland's land as substitute parking was reflected in the judgment orders

entered by the court which allowed the City to acquire the 1331 property by paying monetary

compensation to the 1332 building owner and by providing the 1332 building with substitute

parking.

The record thus demonstrates that the City's agreement to provide Midland's land as substitute property allowed the City to acquire and incorporate the 1331 property into the North Town Village Project. That project, itself a valid public purpose, in turn promoted the valid public purposes reflected in the Redevelopment Plan. Under these circumstances, we conclude that the acquisition of Midland's land is so closely connected with the acquisition of the 1331 property, and so necessary to the carrying out of the North Town Village Project, that the public use and purpose of the project covers the taking of Midland's land.

We also find that this case is distinguishable from the decision in *SWIDA*. Initially, *SWIDA* did not involve substitute condemnation and therefore the court did not have occasion to consider the unique issue before this court. Moreover, *SWIDA* established that each case must turn upon its own set of facts and that the proper focus of courts should be on whether the taking at issue is intended to benefit the public or, instead, purely private interests. The record in this case establishes that the taking of Midland's land was necessary to provide substitute parking and thereby facilitate a valid public purpose and that the public, rather than a private party, is the intended beneficiary of this taking.

Midland claims that the public will derive nothing from this taking because the 1332 building owner is not required to allow the public to park on the property and is not even required to use the property for parking. However, the 1332 building is required pursuant to zoning laws to maintain its accessory parking in order to continue its commercial use. Moreover, the record shows that the purpose of taking Midland's land is to provide the 1332 building owner with substitute parking facilities in order to maintain that commercial use. Midland also points

45

to the City's agreement in the judgment in the 1331 litigation that it would acquire Midland's land and rezone it to conform to the zoning of the 1332 building. Midland claims that its land is already zoned for parking and would therefore not need to be rezoned if the City's true intention was to provide substitute parking. However, at the time the parties in the 1331 litigation agreed to the provision regarding rezoning, Midland's land was zoned as a "General Manufacturing District" and the City was in the process of amending the land use to "Residential and Parking." Therefore, this provision could be a reference to that rezoning and does not establish that the City does not intend to provide a substitute parking facility for the 1332 building. Finally, Midland's argument that no public purpose is served because the 1332 building is not required to allow the public to use the parking facility ignores the fact that this taking arises under substitute condemnation. This case should therefore not be viewed in the context of a typical taking of private property by the government in order to give that property to another private enterprise. To do so would be to view the case too narrowly and to ignore its unique nature. This case must instead be viewed in the larger context in which it has arisen and, when viewed as such, we believe the City's acquisition of the Midland Property passes constitutional scrutiny.

Midland nevertheless argues that this case does not fall within the "very narrow circumstances" under which substitute condemnation is allowed. Midland claims that courts have sanctioned substitute condemnation to take land, but only if the land being taken is conveyed to those who lost land due to government action. Midland points to the fact the 1331 and 1332 properties were held in separate land trusts and asserts that, because under Illinois law land trusts hold equitable and legal title, the two properties were owned by separate entities.

46

Thus, Midland concludes that the owner of the 1332 building did not lose any property that it owned when the City acquired the 1331 property and that the 1332 building owner would be unduly enriched if it were to acquire Midland's land. However, a brief review of the law pertaining to Illinois land trusts convinces us that Midland's claim is without merit.

Both the 1332 building and the 1331 property are held in separate land trusts. In both instances, ANB is the trustee and the 1332 partnership, comprised of four members, is the beneficial owner of the trust. Illinois land trusts have been explained as follows:

> " 'An Illinois land trust is a unique creature of Illinois law whereby real estate is conveyed to a trustee under an arrangement reserving to the beneficiaries the full management and control of the property. "The trustee executes deeds, mortgages or otherwise deals with the property at the written direction of the beneficiaries. The beneficiaries collect rents, improve and operate the property and exercise all rights of ownership other than holding or dealing with the legal title.... While legal title to the real estate is held by the trustee, the beneficiaries retain "the power of direction" to deal with the title, to manage and control the property, to receive proceeds from sales or mortgages and all rentals and avails on the property. The trustee agrees to deal with the *res* of the trust only upon written direction of the beneficiaries....***[Citation.]' " *In re Marriage of Gross*, 324 Ill. App. 3d 872, 875 (2001).

Thus, it has been recognized that the trustee "is a mere vessel of title" who "exercises no control over the property and only acts according to the beneficiaries' directions." *In re Marriage of Gross*, 324 Ill. App. 3d at 875. We also note that a similar issue was addressed by the court in *Department of Conservation v. Franzen*, 43 Ill. App. 3d 374 (1976). In that case, the court was confronted with the issue of whether beneficiaries under separate land trusts to certain parcels were precluded from recovery of severance to their remainders because of an alleged lack of unity of title. The court held that even though the beneficiaries did not hold legal title, they each possessed a beneficial interest in the property condemned and, therefore, unity of ownership or interest was satisfied and the beneficiaries had standing to seek severance damages to their property. *Department of Conservation v. Franzen*, 43 Ill. App. 3d at 384. The court concluded that "the paramount constitutional requirement of just compensation must be allowed to prevail over the niceties of legal title advanced by the State." *Department of Conservation v. Franzen*, 43 Ill. App. 3d at 384.

Although the present case does not involve the issue of standing to seek damages, we believe that the above caselaw illustrates that there is no issue in this case as to whether the owner of the 1332 building was damaged when the City acquired the 1331 property. The 1332 partnership was the beneficial owner of each property. Thus, the partnership reaped all of the economic benefits resulting from both properties, including rents collected from and improvements to either property. Conversely, the partnership also incurred any economic losses resulting from both properties, including those losses resulting from any damage to those properties. Therefore, the 1332 partnership was injured as a result of the City's acquisition of the

48

1331 property and, accordingly, by conveying Midland's land to be used as substitute parking by the 1332 building, the land taken is being conveyed to those who lost land due to government action. Accordingly, Midland's contention to the contrary is without merit.

Midland argues in the alternative that, even if the 1332 and 1331 properties were owned together, then conveying Midland's land to the owner of the 1332 building would be a "gift." Midland claims that, in the 1331 litigation, the 1332 building owner was fully compensated for the loss of the 1331 property by the $2.8 million paid to it by the City, and that to also give the 1332 building owner Midland's land would be to compensate it twice for its lost parking. Midland, however, misunderstands the nature of agreement reached in the 1331 litigation. The 1332 building owner owned the 1331 property but used only the northern portion of that property for parking. When the City acquired the 1331 property, it agreed to compensate the 1332 building owner with both $2.8 million and the northern portion of the Midland property. The $2.8 million thus represented the *monetary* compensation provided by the City and the northern portion of Midland's land represented compensation for the parking that the 1332 building lost, which, because that parking was required to be maintained, could not be compensated for by giving the 1332 building owner money. Accordingly, the 1332 building owner is not being compensated twice for its lost property but, rather, is receiving the compensation the City agreed to provide it in order to acquire the property.

Midland further argues that this case is not proper substitute compensation because substitute compensation only sanctions replacing what is lost and here, the City is seeking to improve the position of the 1332 building owner. This argument again assumes that the 1332

building owner did not own the 1331 property at the time it used that property for parking. However, as discussed above, the 1332 partnership was the beneficiary of each land trust which held the two properties and therefore the 1332 building owner's position would not be improved by providing it with Midland's land.

Midland also claims that substitute condemnation is only allowed when there is no other reasonable alternative and that, in this case, Midland has offered to continue making its land available as parking for the 1332 building for so long as Midland owns that land. However, Midland points to no authority stating that substitute condemnation is allowed only when there is no other alternative. Moreover, as discussed above, the City's decision to acquire Midland's land was not made arbitrarily but instead was made based upon the conclusion that acquiring Midland's land was the best means to secure its right to available parking and that Midland's land was the best location for that parking.

Midland additionally claims that the City is seeking to acquire its property to save money and to use in lieu of cash in order to compensate the 1332 building owner. However, as discussed above, the 1332 building owner could not be fully compensated for its lost parking by money and instead had to be also given substitute property so that it could maintain the parking required in order to continue its commercial use. Therefore, Midland's claim is without merit.

Finally, Midland warns that the consequences of our decision could be "staggering" and could result in abuses of the power of eminent domain. We recognize the inherent danger and potential for abuse in the use of the power of eminent domain. However, the taking in this case is authorized and constitutional and the "[l]egitimate use of governmental power is not prohibited

because of the possibility that the power may be abused." *Gutknecht*, 3 Ill. 2d at 545.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

O'MALLEY, P.J., and J. GORDON, J., concur.