# Illinois Official Reports

## Appellate Court

*Enbridge Energy, Ltd. Partnership v. Fry*, 2017 IL App (3d) 150765

| | |
|---|---|
| Appellate Court Caption | ENBRIDGE ENERGY, LIMITED PARTNERSHIP, Plaintiff-Appellee, v. ROCHELLE M. FRY, DOUG RIECKE, JOHN RIECKE, NON-RECORD CLAIMANTS AND UNKNOWN OWNERS, Defendants-Appellants, and BERNADETTE A. LAMORE, ANYA M. BAUER, NON-RECORD CLAIMANTS AND UNKNOWN OWNERS, Defendants-Appellants. |
| District & No. | Third District<br>Docket No. 3-15-0765 |
| Filed | April 6, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Kankakee County, Nos. 14-ED-4, 14-ED-8; the Hon. Adrienne W. Albrecht, and the Hon. Ronald J. Gerts, Judges, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas J. Pliura and Kathleen Chmielewski, of Law Office of Thomas J. Pliura, of LeRoy, for appellants.<br><br>John M. Spesia and Jacob E. Gancarczyk, of Spesia & Ayers, of Joliet, and Gerald A. Ambrose, of Sidley Austin LLP, of Chicago, for appellee. |

| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion. Presiding Justice Holdridge and Justice Lytton concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Enbridge Energy, Limited Partnership, (Enbridge) filed a condemnation suit to obtain easement rights over certain farmland in Kankakee County so that it could build and operate a new underground pipeline. The landowner defendants opposed the suit for condemnation and filed a traverse and motion to dismiss (traverse motion), which the trial court denied. A jury trial was later held on the condemnation complaint, and a directed verdict was entered for Enbridge as to the amount of just compensation it was required to pay to the landowners. The landowners appeal, raising numerous issues. We affirm the trial court's judgment.

¶ 2                                         FACTS

¶ 3    In April 2014, the Illinois Commerce Commission (ICC) granted Enbridge a certificate of public convenience and necessity to build and operate a new underground liquid petroleum pipeline from Pontiac, Illinois, to Griffith, Indiana. The new pipeline was to be known as "Line 78" and was to run across several properties in Livingston, Grundy, Kankakee, Will, and Cook Counties. For the most part, the path of Line 78 was to run parallel to and in close proximity with an existing Enbridge pipeline—Line 62. To obtain the necessary easement rights for Line 78, Enbridge was granted eminent domain authority by the ICC.

¶ 4    Prior to filing the instant lawsuit, Enbridge negotiated settlements with many of the landowners involved. As to those landowners with whom Enbridge could not reach an agreement on just compensation, Enbridge filed condemnation complaints in the trial court. The complaints (collectively referred to hereinafter as the complaint) were later consolidated. A copy of the ICC order was attached to the complaint. Three of the landowners who did not settle with Enbridge were named as defendants in the instant case. The dispute involved two pieces of farmland in Kankakee County—the Fry property, owned by Rochelle Fry, and the Bauer-Lamore property, owned by Anya Bauer and Bernadette Lamore. In the trial court, Fry, Bauer, and Lamore were represented by the same attorney, who now represents all three of them in this appeal.

¶ 5    In response to the condemnation complaint, Fry filed a traverse motion, alleging, among other things, that Enbridge lacked proper eminent domain authority, that there was no public use or necessity for the pipeline, and that Enbridge had failed to negotiate with the landowners in good faith prior to filing the condemnation suit. A similar traverse motion was later filed on behalf of Bauer and Lamore. Enbridge responded to Fry's traverse motion and attached to its response sworn testimony, affidavits, and business records. Those supporting documents established that Enbridge had made numerous attempts to communicate with the landowners about the easements and the pipeline project. Written offers for easement rights were made to Fry in August 2013 and April 2014 and to Bauer and Lamore in April 2013 and October 2013. The supporting documents also showed that in making its offers to the landowners, Enbridge

had been advised by a licensed real estate appraiser who had conducted a land market study in the counties that were going to be impacted by the pipeline.

¶ 6    Unable to reach an agreement with the three landowners, Enbridge sent a final offer letter to Fry in May 2014 and to Bauer and Lamore in June 2014. The final offer letter was also sent to the landowners' attorney. In that final offer letter, Enbridge offered to pay Fry approximately $51,000 as just compensation and to pay Bauer and Lamore approximately $57,000. A receipt detailing the basis for the offer was provided to all three landowners and their attorney. The final offer was set to expire approximately 11 days from the date of the letter. In addition, Enbridge stated in the letter that it would file an eminent domain action if the final offer was not accepted. None of the three landowners or their attorney responded to those final offers.

¶ 7    A status hearing was held in September 2014, and Fry's traverse motion was set for hearing. When the landowners' attorney told the trial court that he would need some time for discovery, the trial judge responded that, as a general matter, she did not postpone hearings on a motion to dismiss pending discovery but that if the issue arose, she "certainly [could] recess the hearing and give—allow time for discovery." In the 90 days between the filing of Fry's traverse motion and the date of the hearing on the motion, the landowners did not notice or subpoena any depositions, attempt to compel the appearance of any witnesses or the production of any documents at the hearing, or attempt to obtain any rulings from the trial court on any discovery matter related to the traverse motion.

¶ 8    In October 2014, a hearing was held on Fry's traverse motion. At the outset of the hearing, the trial judge acknowledged that a motion had been faxed to the court by the landowners' attorney requesting additional time to conduct discovery. The landowners' attorney indicated in court that he had filed a memorandum on the matter. Despite the request for more time, the trial court went forward with the hearing. The landowners' attorney stated that he was ready to call witnesses but did not seek to do so and did not disclose to the court who those witnesses were or what their testimony would be. Ultimately, although the trial court did not preclude either party from calling witnesses, no witnesses were presented by either side, and the trial court made its ruling on Fry's traverse motion based solely upon the pleadings and supporting documents. After considering those documents, researching the matter, and listening to the arguments of the attorneys, the trial court denied Fry's traverse motion, finding that there was nothing presented to challenge the rebuttable presumption of public use and necessity created by the ICC's order or any evidence presented to refute Enbridge's showing that its offer was made in good faith. Because Bauer and Lamore's traverse motion was essentially identical to that of Fry, the same ruling by the trial court was later applied to that motion as well.

¶ 9    With the traverse motion (collective reference to both motions) decided, the case proceeded toward a jury trial on the condemnation complaint and the issue of just compensation. In November 2014, the trial court entered a case management order, which required that all written discovery be completed by December 22, 2014, that all lay witness depositions be completed by January 20, 2015, that all controlled expert witness disclosures be completed by February 2, 2015, and that all controlled expert depositions be completed by February 20, 2015. The landowners subsequently filed a counterclaim for the damage that the pipeline would allegedly cause to the remainder property (the property outside of the easement area).

¶ 10       On January 7, 2015, the landowners' attorney tendered on a flash drive the work file of his proposed valuation expert, appraiser Michael McCann. The file contained approximately 7000 pages. Later that same month, landowner Bauer was deposed and testified that she did not have knowledge of the fair market value of the subject property and that she was not qualified to determine a diminution in value caused by the pipeline. Similarly, landowner Fry testified in her deposition that she had no opinions, numbers, or anything related to the fair market value of her property.

¶ 11       On February 2, 2015, within the timeframe set by the case management order, Enbridge disclosed their expert valuation witnesses, Joseph Batis and Andrew Brorsen. Brorsen had completed two written appraisal reports, one for each of the properties involved. Brorsen's reports contained his comparable-sales data and an explanation of his opinions as to valuation. Although depositions were taken of Enbridge's valuation experts, the landowners' attorney did not appear for those depositions.

¶ 12       The landowners disclosed their expert valuation witness, appraiser McCann, and tendered a brief summary of his appraisal opinions. McCann did not prepare a written appraisal report, and Enbridge did not take McCann's deposition. After the discovery deadline had passed, the landowners submitted supplemental opinions wherein they disclosed that the defendant landowners had belatedly developed opinions of value based on discussions with their attorney and research into environmental effects, stigma, and fear caused by pipelines.

¶ 13       In a letter dated February 2015, Enbridge's attorneys warned the landowners' attorney in a letter that the controlled expert witness disclosures and the work file of McCann failed to provide any explanation, analysis, or specificity regarding comparable sales. Attached to the letter were previously-served discovery requests to the landowners asking for the comparable-sales sheets. A second letter from Enbridge's attorneys, dated March 2015, requested that the complete work file of McCann be tendered in relation to the subject properties.

¶ 14       In April 2015, about 60 days after the discovery deadline had passed and without obtaining leave of court, the landowners issued a notice of discovery deposition for their controlled expert witness, appraiser McCann. The landowners' attorney, in a later proceeding, acknowledged that the purpose of the deposition was to disclose McCann's new opinions and pointed out that Enbridge had not deposed McCann. On Enbridge's motion, the trial court quashed the notice of deposition.

¶ 15       Prior to trial on the condemnation case, Enbridge filed a number of motions *in limine*. As a result of one such motion, which the trial court granted, the landowners were barred from cross-examining Enbridge's witnesses regarding the specific rights that Enbridge sought to acquire—primarily, that Enbridge sought to acquire the right to mortgage the easement. In another ruling, the trial court barred landowners Fry, Bauer, and Lamore, each of whom had inherited the properties, from testifying as to the value of the properties. The trial court's ruling in that regard was largely based upon the fact that both Fry and Bauer had testified in their prior depositions that they had no idea as to the value of the property. The trial court also ruled that a generic disclosure of "individual [d]efendants" that had been filed by the landowners in February 2015 pursuant to Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007) did not allow the landowners to call a witness to testify at trial that had not been specifically identified.

¶ 16       The jury trial on the condemnation case and the issue of just compensation began on Monday, June 8, 2015. After the case was called for trial, the landowners' attorney offered to

- 4 -

*voir dire* his own controlled expert witness, appraiser McCann, as a time-saving mechanism because, according to the landowners' attorney, if the trial court ruled that it was not going to allow McCann to testify, the landowners would not have any expert opinion testimony to present as to valuation and the case would result in a directed verdict. A *voir dire* of McCann, however, was not conducted at that time. In addition, the landowners' attorney told the trial court that if neither the landowners nor McCann were allowed to testify, a directed verdict would result as well.

¶ 17    In its case-in-chief, Enbridge introduced an evidentiary stipulation in which it agreed to pay for damage to crops and improvements, to provide the landowners with reasonable access to the properties during construction, and to restore the properties following the completion of construction. One of the main witnesses who was called to testify for Enbridge was licensed real estate appraiser, Andrew Brorsen. After describing his background and experience for the jury, Brorsen testified at length on the issue of just compensation. In sum, Brorsen determined and opined that the total just compensation due for the Fry property was $6200 ($3800 for the permanent easement across the property, $2400 for the temporary construction easement, and $0 for the damage to the remainder property because, according to Brorsen, there would be no damage to the remainder property) and that the total due for the Bauer-Lamore property was $6500 ($3400 for the permanent easement, $3100 for the temporary construction easement, and $0 for the damage to the remainder property). Brorsen explained to the jury in great detail how he had reached those conclusions. Of relevance to this appeal, Brorsen stated that he had used a compared-sales approach to determine the fair market value of the whole properties and that he had used a paired-sales approach, in part, to determine that there was no damage to the remainder properties as a result of the pipeline easement. Brorsen's written appraisal reports on the two properties were admitted into evidence, as were exhibits depicting the comparable and paired sales selected by Brorsen in conducting his appraisals. Brorsen acknowledged during his testimony that he had made some mistakes in his appraisal reports; that he had never in his career as an appraiser found that there was damage to a remainder property as the result of a pipeline easement; that in every single appraisal report he prepared for Enbridge, he determined that the diminution in value in the permanent easement area was 25%, regardless of in which county the property was located; and that his firm had been paid over $300,000 for its work on the pipeline project.

¶ 18    During the afternoon of Thursday, June 11, 2015, after Enbridge had rested or was preparing to rest its case, the landowners' attorney indicated that he planned to call multiple witnesses, including his controlled expert witness on valuation, appraiser McCann. Enbridge was given leave by the trial court to *voir dire* McCann prior to his testimony. The *voir dire*, however, could not be conducted until the following morning. Outside the presence of the jury, the trial court and the attorneys discussed when the further proceedings in this case would take place. The following conversation ensued:

> "THE COURT: Okay. What I'm trying to figure out is what to tell the jury. My inclination is to tell them to call to see whether or not they need to come back on Monday because I'm unavailable tomorrow afternoon and it doesn't sound like we're gonna get anywhere close to them until tomorrow.
>
> [AN ENBRIDGE ATTORNEY:] I think that's accurate. I think that if we—that tomorrow we could accomplish the voir dire of Mr. McCann. That's—that's what I think we'll get finished so that would be my—I think that's reasonable.

THE COURT: Okay. I need to go check—do—I need to go check on the logistics of it but we're—have reorganized the entire jury system in an effort to save money.

(Whereupon, there was a recess so taken.)

So they're gonna call tomorrow afternoon to see if they need to come in on Monday.

[AN ENBRIDGE ATTORNEY:] Judge we do have one housekeeping matter before we break for the day so I don't know if you want to release the jury.

THE COURT: I want to release the jury because I'm trying to cause the least inconvenience to them."

¶ 19    After the jury was brought back into the courtroom, the following was stated:

"THE COURT: Okay. Do you all still have pieces of paper on your tablets? Okay.

THE BAILIFF: Well, I told them to leave their tablets in there. Are they gonna need 'em?

THE COURT: Well they're gonna need this phone number, which I'm gonna give you, and they're gonna copy down when they go to leave. Okay. Be seated. I told you when we started we [*sic*] that this is a legally technical case and there would be lots of interruptions, and I would keep them to a minimum. Well I'm trying to figure out how to cause you the least amount of inconvenience. There are some matters that have to be—come up tomorrow that—and I—I also have to tell you that I have a mandatory Judge's meeting—quarterly Judge's meeting tomorrow afternoon.

There are some matters that are gonna happen tomorrow morning that could possibly result in the case not—in us not needing you. I don't know that, and I won't know that, until tomorrow afternoon. So you're definitely not gonna be needed tomorrow, and what I need you to do is call the jury commissioner, whose number I have right here, tomorrow afternoon to find out whether or not you need to come back on Monday. Okay? Any questions about that? Okay.

UNIDENTIFIED JUROR: Any certain time to call? 2:00? 3:00?

THE COURT: I will know by noon so after 1:30 and the courthouse closes at 4:30. Yes?

* * *

THE BAILIFF: But when they call this number it will tell them when to report back?

THE COURT: You're gonna be talking to Diane, the jury commissioner directly. You're not gonna get a message. It's not a voice mail. You'll be talking directly to a human person.

UNIDENTIFIED JUROR: Do we identify the case then or she'll know?

THE COURT: You—you call and say does Judge Albrecht need to [*sic*] me to come on Monday.

UNIDENTIFIED JUROR: But then we may be needed on Tuesday if we don't come on Monday, correct?

THE COURT: No. She—you'll here [*sic*] need to be here on Monday and possibly Tuesday or you won't be needed at all. Okay."

¶ 20    On the following morning, Friday, June 12, 2015, Enbridge's attorneys conducted their *voir dire* of McCann. The purpose of the *voir dire* was to allow the trial court to determine whether McCann had any admissible expert opinions as to valuation. At the time of the *voir dire*, the trial court had before it numerous exhibits, including the pertinent discovery disclosures and responses.

¶ 21    During his *voir dire* testimony, McCann acknowledged that the disclosures that had been tendered in this case regarding his expert opinions did not detail the procedures and methodologies he had used in forming his opinions as to valuation. Rather, the disclosures merely stated that McCann would testify as to the various procedures and methodologies that he had used. In addition, although the disclosures listed comparable sales as one of the things that McCann had considered in forming his opinions, they did not identify a single specific comparable sale that McCann had used for either the Fry property or the Bauer-Lamore property. McCann agreed during his *voir dire* testimony that a person looking at the initial disclosure would not have any idea what particular comparable sales McCann had used in this case without taking McCann's deposition. Furthermore, nowhere in the disclosure was the term "paired sales" mentioned.

¶ 22    When asked about the supplemental disclosure, McCann agreed that (1) at the time of the supplemental disclosure, he had not disclosed any opinions as to the two subject properties; (2) not a single comparable sale was identified that McCann had used to value the whole property for the Fry tract or the Bauer-Lamore tract; and (3) not a single Kankakee County sale was identified. According to McCann, at some time prior to February 2 or 3, 2015 (the date when his opinions on the subject properties were disclosed), he identified in his Kankakee file specific comparable sales in Kankakee County that he believed were comparable to the Fry property and the Bauer-Lamore property. When asked if he had provided that information to the attorney for the landowners, McCann responded that he did not think he had provided his Kankakee file to anyone because no one had asked for it.

¶ 23    McCann stated further during his *voir dire* testimony that on January 7, 2015, he personally turned over a flash drive containing his work file to Enbridge's attorneys. According to McCann, that drive contained his work file for all of the counties that were requested in the email that was forwarded to him—Will, Livingston, McLean, and DeWitt Counties. The email did not mention Kankakee County at all. The work file that McCann turned over did not contain McCann's separate Kankakee file that contained the information on the specific subject properties in this case. McCann commented, however, that there was much information on the flash drive that he tendered in January 2015 that applied to all of the counties, including Kankakee, such as the paired-sales data. In addition, McCann acknowledged that there were hundreds of sales on the drive—it was the properties or interests that had sold in the last number of years in each of the counties, which he had used as a starting point in his analysis.

¶ 24    During the *voir dire*, McCann was shown a letter that Enbridge's attorneys had sent to the landowners' attorney requesting McCann's comparable sales information for the Kankakee County properties. McCann testified that he did not recall ever receiving or seeing that letter. McCann was also shown various requests for documents that had been made by Enbridge's attorneys. Certain paragraphs in those documents requested that all appraisals, memoranda, and comparable-sales sheets relative to McCann's expert opinions be turned over. McCann agreed that since prior to February 2 or 3, 2015 (the date his opinions were disclosed), he had comparable sales from Kankakee County in his Kankakee file that he used in connection with

his value opinions on the Fry property and the Bauer-Lamore property. McCann also agreed that in the sales data that was provided in his work file that was tendered on January 7, 2015, there was not a single sale transaction from Kankakee County.

¶ 25        When McCann was specifically asked by the trial court during the *voir dire* whether, in the 7000 pages of documents that were tendered in his work file, there was a piece of paper that identified the sales he used for both comparable sales and paired sales, he responded that there was not a "single document that identifie[d] which sales [he] specifically used." Later on during the hearing, the trial court took a recess to allow McCann and the landowners' attorney time to try to determine whether certain documents were contained in the work file that had been tendered to Enbridge's attorneys in January 2015. None of those documents could be located in the file that had been tendered. Unable to locate the documents in court, McCann testified that they were all contained in his Kankakee file, which had not been tendered.

¶ 26        At about that point in the *voir dire*, Enbridge's attorneys moved to bar McCann's testimony based upon a violation of discovery rules because McCann had never tendered his Kankakee file, even though Enbridge's attorneys had requested it twice. According to Enbridge's attorneys, because that information had not been tendered, McCann did not have a single comparable sale to rely on in connection with the two properties in the instant case. Enbridge's attorneys stated further that the basis for McCann's opinions had been omitted or withheld from the disclosures that were tendered to Enbridge.

¶ 27        The trial court ultimately granted Enbridge's motion to bar McCann's testimony. In doing so, the trial court pointed out that in February 2015, Enbridge's attorneys had specifically requested that the landowners' attorney produce all appraisals, memoranda, and all documents relating to comparable-sales data, but the landowners' attorney had failed to do so. During the trial court's ruling on the issue, the following conversation ensued:

　　　　"THE COURT: Based on that—based on you having failed to provide any documentation whatsoever that was requested—comparable sales data is a linchpin of Eminent Domain cases and based on your—and it seems almost deliberate—

　　　　[THE LANDOWNERS' ATTORNEY:] Your Honor.

　　　　THE COURT: Your—stop. I'm talking. I'm barring Mr. McCann from testifying based on [Rules] 213 and 214 and actually this is a [Rule] 219 bar.

　　　　[THE LANDOWNERS' ATTORNEY:] Okay. I'd like to make my record, Your Honor, if I may?

　　　　THE COURT: No. You can submit whatever—I—I—

　　　　[THE LANDOWNERS' ATTORNEY:] I—

　　　　THE COURT: I mean you can—you can respond with exhibits, but I don't see—unless you can produce to me something that shows that you've complied with this specific request for comparable sales data, I'm—

　　　　[THE LANDOWNERS' ATTORNEY:] Well, Your Honor, we do have that.

　　　　THE COURT: Where?

　　　　[THE LANDOWNERS' ATTORNEY:] There's—there's 7,000 pages.

　　　　THE COURT: Mr. McCann just testified that his Kankakee comparables and that his—his Kankakee comparables and that his—the—the specific paired sales are not contained in those 7,000 pages.

[THE LANDOWNERS' ATTORNEY:] That's—Your Honor, there are—

THE COURT: And the paired sales are not contained in there.

[THE LANDOWNERS' ATTORNEY:] There are paired sales from—in those files, and we'll provide them on Monday.

THE COURT: No, you may not provide them on Monday. Mr. McCann just testified that he did not produce—that those documents are not contained in those 7,000 pages. I even took a recess for you to be able to produce the documents.

[THE LANDOWNERS' ATTORNEY:] Your Honor, the—the information is in there, and when we started this trial we—

THE COURT: Where is the comparable sales data? I have heard nothing about that. If you have a document that says these are the comparable sales that Mr. McCann is relying upon, these are the paired sales—I mean you chose not to do a written appraisal report. That was your choice. That required you—that made it incumbent upon you to supply the requisite information for your expert's opinion. You didn't do that.

[THE LANDOWNERS' ATTORNEY:] Your Honor—

THE COURT: Under the rules of—under Rule 219 I think the appropriate remedy is to bar Mr. McCann.

[THE LANDOWNERS' ATTORNEY:] Your Honor, I would like to—if—first—well how—how would you like me to finish up my objection on this?

THE COURT: In writing. See you at 10:00 o'clock Monday morning.

[THE LANDOWNERS' ATTORNEY:] Okay. Alrighty, Your Honor. Again, I'd like to make a—at least a statement but if the Court's not gonna allow that then I'll take my que on that. Thank you. We'll see you at 10:00.

THE COURT: Okay."

¶ 28    When the trial resumed on the morning of Monday, June 15, 2015, the jury was not present. The landowners' attorney submitted a written offer of proof as to McCann's testimony. The offer of proof stated that McCann would testify as to the comparable market data and paired sales contained in his work file. Attached to the offer of proof was a copy on compact disc of McCann's 7000 page work file that had been tendered to Enbridge's attorneys in January 2015. Also attached to the offer of proof was an email that the landowners' attorney had received from Enbridge's attorneys in December 2014, requesting information for Livingston, McLean, DeWitt, and Will Counties. Based upon McCann's testimony during *voir dire* that his Kankakee file was never disclosed and the other information before the court, the trial court maintained its ruling barring McCann's testimony.

¶ 29    The trial court then asked the landowners' attorney whether it was correct that the landowners were left without any valuation witnesses. The landowners' attorney responded that he had his witnesses present and that he was ready to start his case. The landowners' attorney indicated that, although the landowners had been barred from giving testimony as to valuation, he intended to have each of the landowners testify that they owned the subject properties. The trial court pointed out that the ownership information had already been presented by Enbridge in its case-in-chief.

¶ 30    The landowners' attorney indicated that he also intended to call to testify the two farm tenants on the properties—John Riecke, the farm tenant on the Fry tract, and Dennis Mathena, the farm tenant on the Bauer-Lamore tract. When asked, the landowners' attorney told the trial

court that he had disclosed the two farm tenants, who were also named as defendants in this case, as valuation witnesses. When Enbridge's attorneys disagreed, the landowners' attorney pointed to his generic disclosure from February 2015, which stated that the defendants were expected to offer opinions as well as facts with respect to the pre- and post-taking value of the property involved, as well as the unique aspects of the real estate in all respects. The disclosure indicated that the defendants based their opinions on the personal knowledge and observation of the real estate in question, their knowledge of the geographic area, discussions with individuals who had opined value of the property, their familiarity with the property taken, the unique aspects of the real estate involved, and their general knowledge of the land values in the area. The trial court found that the disclosure was not sufficient for the two farm tenants to provide expert opinion testimony as to valuation.

¶ 31 The trial court pointed out that the farm tenants were not the owners of the subject properties and asked the landowners' attorney what qualifications the farm tenants had that would allow them to render expert opinions as to valuation. The landowners' attorney responded that Riecke (1) had farmed the Fry property for the past 27 years, (2) had farmed about 2500 acres in the Kankakee area and surrounding counties, including tracts of property that had pipelines, (3) owned five to six different farm tracts with pipelines; (4) had knowledge and experience of real estate, and (5) was knowledgeable as a farmer about farm values in the area. According to the landowners' attorney, Riecke would opine that the value of the Fry property was $10,000 per acre for a total of $800,000 for the entire tract. Riecke believed that there would be a 20 to 25% diminution in value after the pipeline was installed and that the total devaluation to the Fry property caused by the pipeline would be about $180,000.

¶ 32 The landowners' attorney stated further that Mathena would testify that he (1) had been farming for over 30 years, (2) had farmed the Bauer-Lamore property for the past several years, and (3) was familiar with farm values in the area. According to the landowners' attorney, Mathena would opine that the value of the Bauer-Lamore property was approximately $10,000 per acre and that the property would suffer a diminution in value after the pipeline was installed of about $180,000.

¶ 33 As the landowners' attorney was making his argument on the admissibility of the farm tenants' testimony, he inquired of the trial court whether the jury had been discharged from the case. The following conversation ensued:

"THE COURT: The Court—you—you were here for the record. The jury has not been discharged.

[THE LANDOWNERS' ATTORNEY:] Okay. I—I was just—I have the transcript and it appears that the Court said that they were to call in and if they—if they called in on Friday—and I have the transcript here—that they were either gonna—

THE COURT: That may cause some difficulty but I did not technically discharge them.

[THE LANDOWNERS' ATTORNEY:] And then—then my question will be what will happen, Your Honor, if in fact any of the jurors had the misunderstanding that they were not—

THE COURT: I'm not—we're not gonna prejudge that, Mr. [landowners' attorney].

- 10 -

[THE LANDOWNERS' ATTORNEY:] Sure. Sure. Well, I just—I want to go down on the record that—

THE COURT: Well, stop.

[THE LANDOWNERS' ATTORNEY:] Okay.

THE COURT: We're doing one thing at a time. We're dealing with whether or not the tenants are gonna be allowed to testify ***."

¶ 34    After the attorneys had finished making their arguments on that issue, the trial court ruled that the proposed testimony of the farm tenants was barred. The trial court found that the disclosure that was provided did not give the basis for an expert opinion for which the farm tenants were qualified. The trial court commented that she had never seen an eminent domain case that put a farm tenant in the same position as a landowner with regard to the ability to testify to value. The landowners' attorney was later allowed to file written offers of proof as to the testimony of the landowners and the farm tenants.

¶ 35    During the proceedings, Enbridge's attorneys asked that the landowners' counterclaim be dismissed as an Illinois Supreme Court Rule 219 (eff. July 1, 2002) discovery sanction. The trial court ruled that:

"considering the deception that [had] occurred in this case—particularly the disclosure saying that the basis for the expert's opinion was disclosed and the contradiction by the testimony of the expert, also considering the fact that the expert's file—underlying documentation was specifically requested and the expert testified that no one asked him for the contents of the Kankakee file, the Court finds that an appropriate 219 sanction is to dismiss the counterclaim."

¶ 36    When the landowners' attorney asked if he should just file the written offers of proof (those of the landowners and the farm tenants) by the close of business the following day, the trial court responded that it had "a jury pending out there." A recess was taken until the afternoon for the landowners' attorney to file his offers of proof. After the landowners' attorney did so, the trial court reviewed the offers of proof and maintained its ruling that the testimony of the landowners and the farm tenants was barred.

¶ 37    The landowners' attorney rested his case, and Enbridge's attorney moved for a directed verdict. Enbridge's attorney asked that, since the only competent evidence as to valuation was the testimony of Brorsen, a directed verdict be entered in Enbridge's favor, setting the amount of just compensation for the permanent and temporary easements in the amount specified in Brorsen's testimony. The landowners' attorney opposed the motion. After listening to the arguments of the attorneys, the trial court granted Enbridge's motion for directed verdict. In doing so, the trial court stated:

"The Court's previously ruled on Mr. Brorsen's testimony and his qualifications and has refused to strike it. And the Court is frustrated and disappointed that the landowners are being denied their day in court because the Court was forced by the conduct of counsel in failing to supply any of the supporting documentation from the Kankakee files to their opponent to strike the testimony of their expert witness. Therefore, the Court is left with the regrettable decision to allow the motion for directed verdict."

¶ 38    The trial court entered judgment orders for just compensation to be paid to the landowners in the amounts that Enbridge had requested. After doing so, the trial court stated to the clerk,

"Dee, you're gonna have to make sure that the Jury Commissioner knows to inform the jurors that they need not come back tomorrow morning."

¶ 39    The landowners later filed a motion for recusal or substitution of judge, alleging that the judge who had heard the trial had prematurely and improperly discharged the jury on June 12, 2015, and had thus created an appearance of bias and impropriety. The landowners also filed a posttrial motion that made the same claims of bias and impropriety and that alleged that the premature discharge of the jury tainted not only the rulings that were made after the jury was improperly discharged but the rulings that were made before that time as well. In addition, the landowners raised numerous allegations of trial error in the posttrial motion. Attached to the posttrial motion were affidavits from two of the jurors who had sat on the jury for the trial. The affidavits indicated that those two jurors had called the jury commissioner on June 12, 2015, as they had been directed to do by the trial court, and were told by "a female" or an "individual" that the case had finished and that their service as jurors would no longer be needed.

¶ 40    Without ruling on the posttrial motion, the trial judge who had heard the trial recused herself from the case because of a family emergency. The case was assigned to another judge, who ultimately heard and denied the landowners' posttrial motion. In doing so, the posttrial motion judge found, among other things, that Enbridge's appraiser, Andrew Brorsen, provided competent opinions as to valuation; that the jury had not been prematurely discharged; that the landowners made no attempt to trace the source of the information given to their affiants and never obtained an affidavit from the jury commissioner who was available in the courthouse every day; that the landowners failed to show any appearance of bias or impropriety; that the farm tenants were not disclosed witnesses as required by the trial court discovery order; that there was no evidence that the landowners had the requisite knowledge to testify as to value; that the trial court's finding that the landowners were engaged in deception and the trial court's decision to bar appraiser McCann from testifying were firmly based in the facts of the case; and that the landowners' counterclaim was properly dismissed because the landowners had no valuation witnesses. The landowners appealed.

¶ 41                                            ANALYSIS
¶ 42                          I. Issues Related to the Traverse Motion
¶ 43    As their first point of contention on appeal, the landowners argue that the trial court erred in the manner in which it conducted the proceedings on the traverse motion and in finding that Enbridge had negotiated with the landowners in good faith. More specifically, the landowners assert that the trial court erred in (1) treating the traverse motion as a section 2-619 (735 ILCS 5/2-619 (West 2014)) motion to dismiss; (2) ruling upon the traverse motion without allowing the landowners to conduct any pre-hearing discovery and without holding an evidentiary hearing, contrary to the procedures established by case law; and (3) finding that prior to the filing of the condemnation complaint, Enbridge had made a good faith offer of just compensation to the landowners for the easement rights (had negotiated in good faith), despite the fact that Enbridge had not provided to the landowners any basis, such as an appraisal, upon which the landowners could determine whether Enbridge's offer of just compensation was fair. Based upon those alleged errors, the landowners ask that we vacate the trial court's ruling on the traverse motion and that we remand this case for the trial court to conduct new proceedings on that motion in which the proper procedures will be followed.

- 12 -

¶ 44    Enbridge argues that the proceedings in the trial court on the traverse motion were proper and that the trial court's ruling on the motion should be upheld, including the trial court's finding that Enbridge had negotiated in good faith. As to the landowners' specific claims, Enbridge asserts that (1) there is no indication in the record that the trial court treated the traverse motion as a section 2-619 motion to dismiss; (2) the trial court did not deny the landowners' request for discovery as the landowners made no specific discovery requests and obtained no specific rulings from the trial court on discovery matters related to the traverse motion; (3) although the landowners' attorney claimed at the hearing on the motion that he had witnesses ready to testify, no witnesses were ever indentified, called to testify, or barred from testifying, and no offers of proof were ever made as to what the testimony of those alleged witnesses would have been; (4) an evidentiary hearing on a traverse motion is not required under the case law and was not required in this case because the landowners presented no evidence to rebut the presumption of public interest and necessity created by the ICC order or to refute Enbridge's evidence; and (5) the trial court's finding of a good faith offer of just compensation by Enbridge (good faith negotiation) was well supported by the evidence. For all of the reasons set forth, Enbridge asks that we affirm the trial court's ruling, denying the landowners' traverse motion.

¶ 45    A trial court's ruling on a traverse motion will not be reversed on appeal unless it is against the manifest weight of the evidence. *Department of Transportation ex rel. People v. Hunziker*, 342 Ill. App. 3d 588, 593-94 (2003). That same standard of review applies to a trial court's finding of good-faith negotiation in a traverse proceeding. *Department of Transportation ex rel. People v. 151 Interstate Road Corp.*, 209 Ill. 2d 471, 488 (2004). With respect to discovery, the appellate court will not reverse a trial court's ruling on a discovery issue, absent an abuse of discretion. *City of Chicago v. St. John's United Church of Christ*, 404 Ill. App. 3d 505, 516 (2010).

¶ 46    The United States Constitution, the Illinois Constitution, and Illinois statutes all prohibit the government from taking private property for public use without paying just compensation. See U.S. Const., amend. V.; Ill. Const. 1970, art. I, § 15; 735 ILCS 30/10-5-5 (West 2014); *City of Chicago v. Midland Smelting Co.*, 385 Ill. App. 3d 945, 964 (2008). When faced with an eminent domain or condemnation action, a landowner may file a traverse and motion to dismiss (traverse motion) to challenge the condemning authority's right to take the property. *Village of Cary v. Trout Valley Ass'n*, 282 Ill. App. 3d 165, 169 (1996); *Midland Smelting Co.*, 385 Ill. App. 3d at 965. A proceeding on a traverse motion is a preliminary proceeding and should be decided by the trial court without a jury prior to a trial on the issue of just compensation. See *Chicago Land Clearance Comm'n v. White*, 411 Ill. 310, 314 (1952); *City of Naperville v. Old Second National Bank of Aurora*, 327 Ill. App. 3d 734, 739 (2002).

¶ 47    In a traverse proceeding, the condemning authority bears the burden of establishing a *prima facie* case on any disputed allegation. *Midland Smelting Co.*, 385 Ill. App. 3d at 965. Where eminent domain authority is being exercised to acquire property or a property right that will be under private ownership or control, such as in the present case, the condemning authority must prove by clear and convincing evidence that the acquisition of the property or property right meets the following two requirements: (1) that it is primarily for the benefit, use, or enjoyment of the public and (2) that it is necessary for a public purpose. 735 ILCS 30/5-5-5(c) (West 2014). Evidence that the ICC has granted a certificate or otherwise made a

finding of public convenience and necessity in relation to such an acquisition gives rise to a rebuttable presumption that the acquisition satisfies the above two requirements. See *id.*

¶ 48    In addition to those two requirements, prior to filing a condemnation action, the condemning authority must make a good faith effort to reach an agreement with the property owner as to just compensation. See 735 ILCS 30/10-5-10(a) (West 2014); *151 Interstate Road Corp.*, 209 Ill. 2d at 480. The lack of such an effort on the part of the condemning authority requires that the action for condemnation be dismissed. See *151 Interstate Road Corp.*, 209 Ill. 2d at 480-81. Evidence that an offer was made by the condemning authority based upon the advice of an experienced appraisal consultant is generally sufficient to establish a good-faith attempt to agree. *Forest Preserve District v. First National Bank of Franklin Park*, 2011 IL 110759, ¶ 63. To satisfy the good-faith negotiation prerequisite, however, the condemning authority is not required to tender its own appraisals to the landowner. *Id.* ¶ 68. In addition, the condemning authority is not required to provide more than 10 days for negotiations in order to satisfy the good-faith requirement. *Id.*

¶ 49    Having reviewed the record in the present case, we find that it does not support the landowners' assertions on this issue. There is no indication in the record that the trial court considered the traverse motion to be a section 2-619 motion to dismiss; nor is there any indication that the trial court denied any request by the landowners for discovery. Rather, the record shows that the landowners did not attempt to obtain any rulings from the trial court on discovery issues related to the traverse motion. In addition, although the landowners have cited cases where evidentiary hearings were held on traverse motions, those cases do not stand for the proposition that an evidentiary hearing is always required in such a proceeding.

¶ 50    In this case, the ICC order gave rise to a rebuttable presumption that was sufficient to establish Enbridge's *prima facie* case for condemnation. See 735 ILCS 30/5-5-5(c) (West 2014). The burden then shifted to the landowners to rebut that presumption. The landowners presented no evidence to do so. Similarly, although faced with an abundance of evidence showing that Enbridge had made a good faith offer of just compensation, the landowners presented no evidence to dispute or counter the showing that Enbridge had made. As noted above, and contrary to the landowners' assertion here, Enbridge was not required to tender its land market survey to the landowners during negotiations to satisfy the good-faith requirement. See *Forest Preserve District*, 2011 IL 110759, ¶ 68. Under the circumstances of the present case, the trial court did not err in the manner in which it conducted the proceedings on the traverse motion, in finding that Enbridge had made a good faith offer of just compensation, or in ultimately denying the traverse motion. See *151 Interstate Road Corp.*, 209 Ill. 2d at 488; *St. John's United Church of Christ*, 404 Ill. App. 3d at 516; *Hunziker*, 342 Ill. App. 3d at 593-94.

¶ 51                    II. Issues Pertaining to the Trial Court's
                Rulings on the Admissibility of Evidence at Trial

¶ 52    As their next point of contention on appeal, the landowners argue that the trial court erred in certain rulings that it made on the admissibility of the evidence at trial. In support of that argument, the landowners make three primary assertions. First, the landowners contend that the trial court erred in barring them from cross-examining Enbridge's expert witness on two of the specific rights that Enbridge sought in connection with the easement—the right to prohibit access to the temporary easement area during construction and the right to mortgage the

easement. The landowners claim that the rights being sought by Enbridge were discussed by the expert in his direct testimony and that the landowners should have been allowed to question the expert about those rights further in cross-examination to probe the credibility of the expert's opinion that the pipeline would not cause any damage to the remainder property. Second, the landowners contend that the trial court erred when it barred them from testifying as to the value of their property and the amount of remainder damage. The landowners claim that the trial court's ruling in that regard was contrary to the established law and ignored the landowners' supplemental disclosure (tendering their opinions as to value), which amended their prior deposition testimony (stating that they had no opinions as to value). Third, the landowners contend that the trial court also erred in barring the farm tenants from testifying as to the value of the property and the remainder damage as well. The landowners claim that the farm tenants were properly disclosed and that the trial court's ruling barring their testimony was contrary to established law. According to the landowners, any potential criticism that could be made of that testimony because of the farm tenants' level of experience or their possible consideration of improper factors in their valuation went to the weight to be given to the testimony and not to the overall question of admissibility. The landowners claim further that they were severely prejudiced by the trial court's erroneous evidentiary rulings in this case, especially those on the admissibility of the valuation testimony. The landowners ask, therefore, that we reverse the trial court's judgment and that we remand this case for a new trial.

¶ 53    Enbridge specifically disagrees with all of the landowners' assertions on this issue and argues that the trial court's evidentiary rulings were proper and should be upheld. As to each of the three primary allegations of error listed of above, Enbridge claims that the evidence was properly excluded by the trial court because the evidence was irrelevant, was improper, or had not been properly disclosed. Enbridge asks, therefore, that we reject the landowners' argument on this issue and that we affirm the trial court's judgment.

¶ 54    A trial court's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008). The threshold for finding an abuse of discretion is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable or that no reasonable person would have taken the view adopted by the trial court. See *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009); *Leona W.*, 228 Ill. 2d at 460. If the trial court commits an abuse of discretion, a new trial should be ordered only if the trial court's ruling appears to have affected the outcome of the trial. See *Leona W.*, 228 Ill. 2d at 460; *Troyan v. Reyes*, 367 Ill. App. 3d 729, 732-33 (2006).

¶ 55    After reviewing the record in the instant case, we find that the trial court's evidentiary rulings at trial on the condemnation complaint did not constitute an abuse of discretion. In making its rulings, the trial court considered the relevance and propriety of the evidence that the landowners sought to present and ultimately determined, in its discretion, that the evidence was not admissible. First, regarding the denial of the landowners' ability to cross-examine Enbridge's valuation witness as to the specific rights Enbridge sought to acquire, the trial court correctly found that the information that the landowners sought to elicit in that regard was not relevant to the matters at issue. Enbridge had already agreed in the evidentiary stipulation to provide reasonable access to the landowners. Therefore, any question about whether Enbridge had the right, under the terms of the easement, to restrict access to the easement area would not have made the existence or non-existence of any material fact in the case more or less probable.

See Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011); *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 57 (2000) (relevant evidence is evidence that has any tendency to make the existence of any material fact more or less probable than it would be without the evidence). In addition, as Enbridge correctly notes, any temporary interference with access to the easement area could not, under the law, cause damage to the remainder property. See *Trunkline Gas Co. v. O'Bryan*, 21 Ill. 2d 95, 100-01 (1960) (recognizing the settled law that the temporary consequential interference with the use of farm property caused by the construction of a public improvement was not a proper element of damage to the land not taken). It would also not have been proper under the law to allow the landowners to suggest to the jury in cross-examination that there were potential negative consequences that could result if Enbridge obtained an easement on the mortgage when the landowners had no evidence whatsoever to suggest that those negative consequences could or would occur. See *Department of Public Works & Buildings v. Mitchell*, 9 Ill. App. 3d 120, 123-24 (1973) (finding that it was improper for the condemnor's attorney to inject into the case during cross-examination highly speculative evidence, which was contrary to the pleadings and all of the other basic evidence, that the value of the remainder property would possibly be increased by the condemnation).

¶ 56 Second, regarding the landowners' attempt to present their own testimony as to the value of the property, that testimony would have been directly contrary to the landowners' prior statements at the deposition that they had no idea as to the value of their property and to the landowners' attorney's statement that the landowners had no opinions of value initially. It was clear that the proposed testimony was nothing more than an impermissible attempt to get around the trial court's ruling barring the landowners' expert appraiser from testifying by having the landowners testify to new opinions that they had formed after consulting with their attorney. In addition, a review of the offers of proof indicates that the landowners considered improper factors in forming their opinions of value, such as possible stigma of having a pipeline on the property and the potential for a pipeline spill. The landowners' opinions were properly barred for that reason as well. See *Trunkline*, 21 Ill. 2d at 100 (recognizing that the speculative possibility of a remote injury that could result from having a pipeline on a property was not a proper element to be considered in determining whether there would be damage to the remainder property and that the testimony of a witness, who had considered an improper element of damage, would be deemed incompetent); *City of Mt. Olive v. Braje*, 366 Ill. 132, 137 (1937) (finding that it was improper for the condemnor's attorney to elicit during the cross-examination of one of the landowners' valuation witnesses evidence as to the sale price of that witness's own farm, which was directly across the street from the subject property, when the sale of that witness's farm was not a voluntary sale and the testimony was not, therefore, competent evidence of value).

¶ 57 Third, as for the testimony of the farm tenants, even if the farm tenants were sufficiently qualified to give an opinion as to the value of the property, the farm tenants had not been specifically identified as potential trial witnesses on valuation in the discovery materials that had been tendered by the landowners. Thus, we cannot say that it was error for the trial court to bar the farm tenants from testifying. Under the circumstances of the present case, we conclude that the trial court's evidentiary rulings were proper. See *Leona W.*, 228 Ill. 2d at 460; *Blum*, 235 Ill. 2d at 36.

¶ 58                III. Issues Regarding the Trial Court's Imposition
                  of Discovery Sanctions Against the Landowners at Trial

¶ 59        As their third point of contention on appeal, the landowners argue that the trial court erred by barring the landowners' expert witness, McCann, from testifying and by dismissing the landowners' counterclaim as discovery sanctions at trial. The landowners assert that the sanctions were inappropriate for several reasons. As for the barring of McCann, the landowners contend first that the sanction was inconsistent with the purpose of Illinois Supreme Court Rule 219, which is to coerce compliance with discovery, rather than to punish the dilatory party. Second, the landowners contend that the sanction was far too harsh in nature, especially in light of the fact that the landowners had not been sanctioned previously by the trial court in this case. In making that contention, the landowners point out that Enbridge did not file a motion to compel disclosure of the information that it sought (the comparable-sales and paired-sales data) and that Enbridge actively opposed the landowners' attempt to ensure that all of the information relevant to McCann's testimony had been disclosed when Enbridge sought to quash the notice of McCann's deposition. According to the landowners, Enbridge purposefully waited until it had finished its case at trial and then sought to bar the testimony of McCann. Thus, the landowners claim that Enbridge's actions regarding this discovery matter were nothing more than the type of tactical gamesmanship the discovery rules were designed to prevent. Third, the landowners contend that the trial court failed to consider the factors it was required to consider under the law to determine whether such a sanction was appropriate. As for the dismissal of the counterclaim, the landowners make many of the same contentions—that the sanction did not serve the purpose of Rule 219, that it was far too harsh in nature, and that the sole purpose of the sanction was to punish the landowners for the alleged discovery violation. Because of the alleged error in imposing sanctions, the landowners ask that we reverse the trial court's judgment and that we remand this case for a new trial on the condemnation complaint.

¶ 60        Enbridge argues that the discovery sanctions imposed by the trial court were proper and should be upheld. Regarding the barring of McCann's testimony, Enbridge asserts that the sanction was appropriate because the landowners' attorney and their expert had failed to comply with their disclosure obligations in that they had failed to produce crucial evidence—the comparable- and paired-sales data—until during the trial. In making that assertion, Enbridge points out that the trial judge found, and the posttrial motion judge later confirmed, that the discovery violation was almost deliberate in nature. As for the landowners' claim that Enbridge was engaging in tactical gamesmanship, Enbridge responds that it was the landowners' burden under Rule 213(f)(3) to disclose their controlled expert witness's opinions and the bases for those opinions. Enbridge responds further that it had no obligation under the law to inform the landowners of possible defects in the evidence the landowners planned to present, although Enbridge did do so by making discovery requests for the bases of McCann's opinion and by warning the landowners that there were significant flaws in McCann's opinions and disclosures. Furthermore, according to Enbridge, the landowners' attempt to take McCann's deposition 60 days after the discovery cutoff date and without leave of court was an impermissible effort to disclose new opinions and was properly denied by the trial court. Regarding the propriety of the dismissal of the landowners' counterclaim, Enbridge does not specifically address that contention in its brief, other than to state that the landowners had an

obligation to prove their counterclaim. For all of the reasons stated, Enbridge asks that we affirm the trial court's judgment.

¶ 61    Illinois Supreme Court Rule 219(c) authorizes the trial court to impose a sanction, including the dismissal of the cause of action, upon any party who unreasonably refuses to comply with any provision of the supreme court's discovery rules or any order entered pursuant to those rules. See Ill. S. Ct. R. 219(c) (eff. July 1, 2002); *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998). The determination of whether to impose a sanction under Rule 219(c) and the particular sanction to impose rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. See *Shimanovsky*, 181 Ill. 2d at 120.

¶ 62    When imposing a sanction under Rule 219(c), the trial court's purpose is to coerce compliance with discovery rules and orders and not to punish the non-complying party. *Id.* at 123. An order of dismissal with prejudice is a drastic sanction and should be invoked only in those cases where the party's actions show a deliberate, contumacious, or unwarranted disregard of the trial court's authority. *Id.* Because dismissal with prejudice is such a drastic sanction, it should be used only as a last resort and only after all the court's other enforcement powers have failed to advance the litigation. *Id.* In determining whether to impose a sanction upon a party under Rule 219(c) and the appropriate sanction to impose, the trial court should consider the following factors: (1) the surprise to the adverse party (the party moving for sanctions), (2) the prejudicial effect of the proffered testimony or evidence, (3) the nature of the testimony or evidence, (4) the diligence of the adverse party in seeking discovery, (5) the timeliness of the adverse party's objection to the testimony or evidence, and (6) the good faith of the party offering the testimony or evidence. *Id.* at 124. No single factor, however, is determinative in the analysis. *Id.*

¶ 63    Having reviewed the record in the present case, we find that the trial court did not err in the discovery sanctions it imposed upon the landowners. The record in this case shows that Enbridge had made repeated requests for the underlying bases of McCann's expert opinion as to valuation. Despite those repeated requests, the landowners never tendered that information. Instead, the landowners tendered 7000 pages of documents and repeatedly asserted, despite McCann's *voir dire* testimony to the contrary, that the bases information had been tendered. In barring McCann's testimony, the trial judge found essentially that the landowners had engaged in deceptive behavior, a finding that was later upheld by the posttrial motion judge. As for the counterclaim, whether dismissal was an appropriate discovery sanction is a moot point. Without any evidence to establish that the pipeline would cause damage to the remainder property, the landowners' counterclaim could not stand and was properly dismissed. We find, therefore, that under the circumstances of the present case, the trial court did not commit an abuse of discretion in imposing the discovery sanctions upon the landowners. See *id.* at 120; *Leona W.*, 228 Ill. 2d at 460; *Blum*, 235 Ill. 2d at 36.

¶ 64                        IV. Issues Relating to the Trial Court's
                            Alleged Premature Discharge of the Jury

¶ 65    As their fourth point of contention on appeal, the landowners argue that the trial judge erred and created the appearance of impropriety by prematurely discharging the jury during the jury trial on the condemnation complaint. More specifically, the landowners assert that the circumstantial evidence contained in the record indicates that the trial judge in this case either

prematurely discharged the jury or gave the jury the impression that it had been discharged, and that by doing so, the trial judge created an appearance of impropriety, bias, and prejudice that, by itself, requires that a new trial be granted. In addition, according to the landowners, when the premature discharge of the jury is viewed in connection with the trial judge's rulings in this case—especially the subsequent rulings barring the landowners' last witnesses, imposing sanctions on the landowners, and granting a directed verdict for Enbridge—the appearance of impropriety is made even stronger. The landowners assert further that the posttrial motion judge's finding—that the trial judge's statements prove that the jury had not been discharged—is directly contrary to the case law on this issue. Therefore, because of the alleged error and the alleged appearance of impropriety it created, the landowners ask that we reverse the trial court's judgment and that we remand this case for a new trial.

¶ 66    Enbridge argues that the posttrial motion judge's decision on this issue—that the landowners had not shown that the jury was prematurely discharged or that there was an appearance of bias or impropriety—was not against the manifest weight of the evidence and should be upheld on appeal. According to Enbridge, the landowners' allegations of bias and impropriety have no good faith basis in law or fact and were nothing more than an impermissible attempt by the landowners at "judge-shopping" after the landowners had received a series of adverse rulings from the trial judge. In support of that assertion, Enbridge points out that the only evidence presented by the landowners in the trial court to support their claim that the jury had been prematurely discharged was the hearsay statements of two of the jurors and the landowners' attorney that the jurors had been told by some unnamed individual that the case was over. Enbridge maintains, therefore, that the landowners have failed to show actual prejudice in this case, which Enbridge asserts is the required standard, rather than the appearance-of-impropriety standard that was suggested by the landowners. For all of the reasons stated, Enbridge asks that we reject the landowners' assertions on this issue and that we affirm the judgment of the trial court.

¶ 67    Under the Code of Judicial Conduct, a trial judge must (1) avoid both impropriety and the appearance of impropriety, (2) perform his duties impartially and without bias or prejudice, and (3) disqualify himself or herself in any proceeding where his impartiality might reasonably be questioned. See Ill. S. Ct. R. 62 (eff. Oct. 15, 1993); R. 63 (eff. July 1, 2013). A trial judge is presumed to be both fair and impartial, and a party claiming judicial bias has the burden of overcoming that presumption of impartiality. See *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002); *Calabrese v. Benitez*, 2015 IL App (3d) 130827, ¶ 25; *Lesher v. Trent*, 407 Ill. App. 3d 1170, 1176 (2011). Adverse rulings alone are almost never sufficient to support a claim of judicial bias, even if those rulings are alleged to be erroneous. *Eychaner*, 202 Ill. 2d at 280. Rather, the party claiming judicial bias must show that the judge in question (1) had a personal bias stemming from some source other than the litigation or (2) made comments in the course of the proceedings that revealed such a high degree of favoritism or antagonism on the part of the judge as to make fair judgment impossible. See *id.* at 280-81; *Lesher*, 407 Ill. App. 3d at 1176.

¶ 68    In this particular case, the landowners' claim of judicial bias or the appearance of judicial bias stems from the landowners' assertion that the trial judge prematurely discharged the jury during the jury trial on the condemnation complaint. It cannot be disputed that the integrity of a jury's verdict must be above question. See *People v. DeStefano*, 64 Ill. App. 2d 389, 407 (1965). After a jury is discharged, its control over a case comes to an end, and the jury

generally cannot be recalled to alter or amend a verdict. See *Bond v. Wood*, 69 Ill. 282, 284 (1873). The crucial question in addressing whether a jury has been irrevocably discharged is whether the trial court has lost control of the jury such that the shield that protects the jury from outside contacts and influence has been removed. See *People v. Gale*, 132 Ill. App. 2d 986, 993-94 (1971); *People v. McNeeley*, 216 Ill. App. 3d 647, 652 (1991). The posttrial motion judge here considered that question and made a factual finding that the jury had not been prematurely discharged. A factual finding by the trial court will generally not be reversed on appeal unless it is against the manifest weight of the evidence—that is, unless it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. See *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006).

¶ 69    Upon a thorough review of the record in the light of the issue raised, we find that the posttrial motion judge's ruling was well supported by the evidence. It is clear from the record that the trial judge was scheduling the jury's presence in the courtroom in such a manner so as to minimize any inconvenience to the jurors and was allowing the jurors to phone the court house to determine if their appearance was required, rather than merely having the jurors physically be present at the court house. When the trial judge was specifically asked by the landowners' attorney whether the jury had been discharged, she responded that she had not technically discharged the jury. In addition, when the landowners' attorney asked if he could tender his offers of proof by the close of business the following day, the trial judge rebuked his request, stating that she still had the pending jury out there. Furthermore, after the jury trial proceedings had concluded, the trial judge directed her clerk to let the jury commissioner know that the jurors would no longer be needed so that the jurors could be properly informed—a step which would not have been necessary if the jury had already been discharged. The only evidence presented by the landowners to contradict what was contained in the record was the hearsay statements of two of the jurors and the landowners' attorney that the jurors had called the jury commissioner and were told by an unnamed individual that the case was over and that they were no longer needed. As the posttrial motion judge noted, however, the landowners did not obtain an affidavit from the jury commissioner as to what had occurred, despite the fact that the jury commissioner was present at the court house every day. Moreover, there is simply no indication in this case that the trial judge lost control of the jury or that the protective shield that must surround the jury had been removed. See *Gale*, 132 Ill. App. 2d at 993-94; *McNeeley*, 216 Ill. App. 3d at 652. Therefore, under the circumstances of the present case, we find that the posttrial motion judge's ruling—that the jury had not been prematurely discharged—was not against the manifest weight of the evidence and must be upheld. See *Best*, 223 Ill. 2d at 350-51; *Gale*, 132 Ill. App. 2d at 993-94; *McNeeley*, 216 Ill. App. 3d at 652.

¶ 70    By reaching that conclusion, we have rejected the underlying factual premise upon which the landowners' claim of judicial bias was based. We need not, therefore, address any further the landowners' claim of judicial bias or resolve the question of whether the appearance-of-impropriety standard or the actual-prejudice standard should be applied under the factual circumstances of the present case.

## V. Issues Pertaining to the Trial Court's
### Grant of a Directed Verdict for Enbridge

As their final contention on appeal, the landowners argue that the trial court erred in granting Enbridge's motion for a directed verdict at the conclusion of the landowners' case-in-chief. However, as the landowners' own attorney noted more than once during the trial proceedings, a directed verdict was properly granted for Enbridge because the landowners had no evidence of valuation to present. See *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992) (recognizing that a motion for a directed verdict in a jury trial is properly granted in those limited cases where all of the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand). We, therefore, affirm the trial court's grant of a directed verdict for Enbridge.

### CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Kankakee County.

Affirmed.